KENNETH A. SMITH AND JILL M. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 29098-90
United States Tax Court
T.C. Memo 1993-140; 1993 Tax Ct. Memo LEXIS 138; 65 T.C.M. (CCH) 2289; April 5, 1993, Filed *138 Decision will be entered for respondent. For petitioners: D. James Manning. For respondent: Mary P. Kimmel. TANNENWALD
TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for 1982, 1985, 1986, and 1987 of $ 41,012.50, $ 24,439.46, $ 58,425.04, and $ 62,716.16, respectively. The sole issue [1] for decision is whether petitioners' horse-breeding activity during the taxable years 1985, 1986, and 1987 constituted an activity "not engaged in for profit" within the meaning of section 183(a). [2]
FINDINGS OF FACT Some of *139 the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by reference. Petitioners Kenneth A. Smith (Mr. Smith) and Jill M. Smith (Mrs. Smith) resided in Pocatello, Idaho, when the petition in this case was filed. [3] They filed joint Federal income tax returns for the years at issue with the Internal Revenue Service Center, Ogden, Utah. Mr. Smith has been employed as a professor of accounting at Idaho State University since 1970 and is a certified public accountant (C.P.A.). In addition to his full-time teaching position, Mr. Smith owns an interest in several businesses which assist accountants in preparing for the C.P.A. exam. [4] Mrs. Smith is also an accounting professor at Idaho State University, and, except for the years 1983 through 1986, has worked full time in that capacity. *140 Petitioners have been involved with horses the greater part of their married life. From 1971 through 1980, they owned two pleasure horses which were used primarily for camping, trail riding, and participating in a local horse club. Mrs. Smith, who developed a keen interest in horses as a child taking riding lessons, is a skilled rider and has successfully competed in horse shows. Having developed an interest in the breeding, showing, and marketing of appaloosa horses, petitioners formed KJ Appaloosas (a partnership) in 1981 and initially acquired two mares from Don DeRoche, a well respected regional trainer in Idaho Falls who specialized in the appaloosa breed. At that time, both mares were in foal by a purportedly up and coming appaloosa stallion in Mr. DeRoche's possession. Petitioners' relationship with Mr. DeRoche originated in 1979 when he assisted them in locating, purchasing, and training a pleasure horse. During the approximately 2-year period such horse was in training, petitioners and Mr. DeRoche regularly discussed opportunities for investing in the appaloosa breed. [5] Petitioners' decision to form KJ Appaloosas was due primarily to Mr. DeRoche's apparent success *141 in the appaloosa business. To a great extent, they relied on Mr. DeRoche's advice regarding which horses to purchase, which stallions to breed their mares with, which shows to attend, and how to promote their breeding operation. During the initial phases of KJ Appaloosas, they consulted with Mr. DeRoche on a weekly basis. Prior to and after 1983, petitioners also sought advice from an established appaloosa breeder named Lou Eklund. [6] Petitioners considered Mr. Eklund to be a "well-recognized expert at the national level" and consulted him regularly in respect of how successfully to structure and operate KJ Appaloosas, the development of their facility, the future of the appaloosa breeding industry, and the marketing of their particular horses. *142 In 1982, petitioners determined that the only way for KJ Appaloosas to establish itself as a successful breeder was to attain a national reputation. They further determined that the two mares purchased in 1981 were a "local backyard type of a horse for regional or very local shows," inadequate to elevate KJ Appaloosas to the national level, and that it would be necessary to purchase "national quality" mares for breeding to stallions of similar quality. [7] *143 Petitioners intended eventually (by 1984 or 1985) to have acquired six or seven national quality mares, which they estimated would yield four or five foals yearly, generating revenues of between $ 150,000 and $ 200,000 a year. In 1983, petitioners acquired their first national quality mares, Bardot Darling and Honky Tonk Gal, which were offspring of a stallion known as The Executive (a nationally known stallion owned by Mr. Eklund, see supra note 6, and hereinafter sometimes referred to as Executive). [8] These mares had previously yielded foals which sold for between $ 25,000 and $ 35,000. Petitioners originally intended to breed all their national quality mares with The Executive, or its offspring. However, as a result of the increasing popularity of the Executive line within petitioners' region, and the attendant competition in marketing Executive offspring, their breeding program was modified to include other nationally recognized appaloosa lines. At or about the same time that petitioners acquired their first two national quality mares, they purchased The Counselor, an Executive son. Petitioners acquired The Counselor to compete in horse shows and generally to promote The Executive bloodline. Initially (1982-1983), petitioners boarded their horses at a facility in Idaho Falls at a cost of between $ 100 and $ 200 each month per horse, depending on whether a particular horse was in training. In an effort to reduce costs, *144 petitioners decided in 1983 to construct a facility of their own, which would contain 20 stalls and an indoor riding arena. To this end, they acquired a 20-acre tract of land across the street from their personal residence and secured a 10-year Small Business Association (SBA) loan of $ 230,000 to finance the facility. Although the facility was slated for completion in October 1983, it was not completed until spring of 1984 due to an early winter and delays in obtaining the necessary building materials. As a result, petitioners were forced to board their horses at the Idaho Falls facility an additional year, thus incurring the substantial boarding expenses. In addition to the SBA loan, petitioners obtained a $ 70,000 operating line of credit from Idaho First National Bank to pay for fencing, expansion, and operating expenses. Petitioners first began promoting their horses at regional shows in the summer of 1984, attending such shows almost every weekend throughout the summer. Also in 1984, one of petitioners' horses was shown by Mr. DeRoche at a national show. After showing extensively in the regional shows that summer, petitioners determined that the most efficacious way to *145 attain the national reputation KJ Appaloosas needed was to alter their focus so as to concentrate more on the national and world shows, spending less time showing at regional events. In 1985, petitioners retained two nationally recognized appaloosa trainers to show their horses at the national and world shows, and to advise them in respect of breeding, purchasing, and marketing appaloosas. These trainers were subsequently (in 1987) replaced with another highly successful trainer who had raised and/or trained 69 national, world, and reserve champions. In addition to training and showing petitioners' horses, he advised them in respect of the breeding and marketing of their horses, and helped them develop their overall program. Petitioners met with this trainer approximately three to four times a year to discuss such matters, and to chart the future development of KJ Appaloosas. Also in 1985, petitioners acquired three additional mares. The first, Lad's Mighty Bar, was a national quality mare which eventually won a national and two world championships. The second, Al's Roman Annie, purportedly had the potential to become a national quality mare. Both were purchased on the advice *146 of their trainers with the intention that KJ Appaloosas expand its breeding program beyond The Executive line. The third, Ms. Impressibility, was a quarter horse which petitioners thought would make a good mare. By 1986, KJ Appaloosas' stable of horses had grown in number to between 15 and 23 depending upon how many horses were away in training. In that year, petitioners acquired another gelding, Classified, which became a world champion, as well as an additional breeding mare. As part of their plan to attain national recognition for KJ Appaloosas, petitioners mounted an advertising program. They engaged a professional agency to develop a logo for KJ Appaloosas, and placed advertisements in various regional and national appaloosa publications and trade journals, including Appaloosa Journal, Appaloosa News, Appaloosa World, and Horse Times, during 1985 and 1986. Petitioners also sent letters to appaloosa trainers throughout the country promoting KJ Appaloosas, and offering a commission on the sale of horses. Petitioners advertised in their local newspapers those horses that were not marketable at the national level. In a further effort to establish KJ Appaloosas as a quality *147 breeder, petitioners associated with the Inter-Mountain Appaloosa Horse Club, a local and regional organization, and the Sagebrush Circuit, a larger regional organization which is a collection of appaloosa horse clubs. They served on each organization's board of directors and managed shows on behalf of the Sagebrush Circuit from 1986 to 1988. Through their involvement in these organizations, petitioners sought to establish relationships with trainers, judges, and other owners in the appaloosa industry and to identify prospective buyers of their horses. During this period of time, petitioners invested hundreds of hours of their time in such activities. Throughout the years at issue, petitioners were extensively involved in the day-to-day activities of KJ Appaloosas. Mrs. Smith, who had acquired substantial experience raising, training, and showing horses, worked full time in the operation of KJ Appaloosas from 1983 to 1986, during which time she was on a leave of absence from Idaho State University. In 1987, she resumed her teaching position at Idaho State and worked part time in the operation. Mrs. Smith was essentially in charge of the daily regimen, which included feeding, *148 watering, exercising, training, and riding the horses, cleaning the stalls, and, when necessary, administering shots or caring for wounds. Beginning in 1985, because of the substantial time requirements of caring for the horses, a full-time daily laborer was employed to assist Mrs. Smith. Mr. Smith's participation in KJ Appaloosas was somewhat more limited due to his full-time teaching position and the various outside businesses in which he was involved. During the academic year, Mr. Smith assisted in the daily responsibilities, working in the mornings, evenings, and on weekends; during the Christmas holidays and summer recess, he devoted full time to the breeding and showing activities. Mr. Smith was also in charge of maintaining the books and records relating to KJ Appaloosas. In this respect, he devised a computer program that reconciled bank account balances, maintained a journal and ledger, and provided a monthly comparison of actual and budgeted expenditures. At year end, the program would print the necessary tax records as well as an annual general ledger. From information stored in the computer, Mr. Smith prepared financial statements and other documents which were *149 necessary to obtain financing for KJ Appaloosas. During the winter months, when a mare typically foals, petitioners alternated waking up every 2 to 3 hours at night and making the one-half mile trip to the barn to check on the mares, and, if necessary, assist in the delivery. Petitioners attended seminars in respect of veterinary care, nutritional matters, breeding, and the judging of horses, and both read the pertinent national appaloosa publications to educate themselves. Petitioners experienced various setbacks in their attempts to establish KJ Appaloosas as a national breeder. The first took place in late 1983 when Classified broke a leg while in training at Mr. DeRoche's facility and had to be put down. He was not insured against loss. The next setback occurred in January of 1984 when Bardot Darling aborted her foal, which would have been the first petitioners would have offered for sale in the national market. In 1984, petitioners suffered a third setback, when, the night before Honky Tonk Girl arrived at a ranch in Texas for breeding to a nationally reputed stallion (Roman Straw Man), the ranch (and stallion) was seized by the FBI in connection with its owner's illegal *150 drug activities. Although petitioners eventually were able to breed Honky Tonk Girl to the stallion in May or June, by that time it was late in the breeding season and such breeding was unsuccessful. The following breeding season petitioners attempted a second time to have Honky Tonk Girl bred with Roman Straw Man, but it was unsuccessful. A further setback occurred in 1985 when the stallion Mountain Lion sustained an injury from which he never fully recovered. Although petitioners originally anticipated selling him for approximately $ 10,000, they received only $ 2,500 due to his condition following the injury. A year later in 1986, petitioners suffered another reversal when Bardot Darling, for which petitioners had paid $ 25,000, developed colic and died. She was not insured against loss. Beginning in 1986, there were several industrywide crises which adversely affected the market for appaloosas. First, the market for regional appaloosas constricted, apparently in some degree the result of certain tax law changes which occurred in 1986. Second, the collapse of the oil and gas industry (in Texas and Oklahoma), in which numerous breeders were involved, reduced the number *151 of prospective buyers for KJ Appaloosas' horses. Such collapse apparently precipitated a rash of bankruptcies among breeders which, consequently, occasioned a significant number of quality horses being placed on the market at "fire sale" or liquidation prices, thus depressing the value of such horses in KJ Appaloosas' inventory. In spite of the various setbacks, and the depressed state of the appaloosa industry generally, petitioners determined that the market for appaloosas would recover sometime in 1987 or 1988 and that KJ Appaloosas should continue in operation despite current difficulties. In making such determination, petitioners consulted with (1) their trainers, (2) Mr. Eklund, and (3) other people knowledgeable in the appaloosa industry. During and after 1986, petitioners sought to reduce the costs of operating KJ Appaloosas. In this respect, they started growing their own hay to reduce feed costs. Petitioners also suspended their national magazine advertising program, which was costing them approximately $ 13,000 a year. In its place, they relied on show involvement and personal contact with prospective buyers to market KJ Appaloosas. Similarly, petitioners took measures *152 to generate additional revenues. In this connection, they leased a portion of their stable facility, and an accompanying mobile home, to an outside quarter horse operation. They also entered into an agreement with their trainer whereby their truck and trailer would be used to transport other breeders' horses to shows for a fee whenever it was being used to transport petitioners' horses to such shows. By 1989, it became apparent that the appaloosa market was not going to recover. That fact, in conjunction with petitioners' inability to continue financing the breeding operation, resulted in their decision to liquidate KJ Appaloosas. At that time, all equipment used in the breeding operation, as well as KJ Appaloosas' entire inventory of appaloosas, was sold. The only remaining asset at the time of trial was the facility, which was listed for sale with a real estate broker. From 1982 to 1987, petitioners purchased 17 horses for their breeding operation at an aggregate cost of $ 184,825 and incurred breeding fees of $ 24,750. During that same period, they sold (or exchanged) 20 horses for an aggregate price of $ 91,102. [9]
*153 Petitioners reported the following gross income, deductions other than those attributable to KJ Appaloosas, and losses of KJ Appaloosas on their tax returns for 1981 through 1989: Gross
Year
Income
Deductions
Losses
1981
$ 174,186
$ 22,502
$ 12,522
1982
185,152
[1] 22,840
40,889
1983
161,996
20,893
95,376
1984
195,383
21,364
169,030
1985
120,622
--  219,592
1986
213,635
[2] --  243,121
1987
196,639
[3] 3,760
(Standard)
168,492
1988
162,843
[4] --  228,334
1989
234,824
--  187,493
$ 1,645,280
$ 1,364,849
The following table reflects the synthesis of various exhibits setting forth projections and budget estimates by petitioners at various times during the period 1983 to 1988: *154 1981
1982
1983
Actual
Actual
Projection
Actual
Gross
Income
$ (200)
$ 1,058 $ 10,500 $ 5,930 Expenses
(excl.
interest
and
deprec.)
(9,194)
(25,903)
(22,300)
(60,626)
Profit
(Loss) (excl.
interest
and
deprec.)
(9,394)
(24,845)
(11,800)
(54,696)
Interest
--  --  ( 5,000)
( 6,766)
Profit
(Loss)
(excl.
deprec.)
(9,394)
(24,845)
(16,800)
(61,462)
Deprec.
(3,128)
(16,044)
(25,000)
(33,914)
Profit
(Loss)
after
interest
deprec.
(12,522)
(40,889)
(41,800)
(95,376)
1984
1985
Projection
Actual
Projection
Actual
Gross
Income
$ 37,000 $ 3,301 $63,000 $ 20,766 Expenses
(excl.
interest
and
deprec.)
(21,000)
( 71,567)
(22,500)
(106,304)
Profit
(Loss) (excl.
interest
and
deprec.)
16,000 ( 68,266)
40,500 ( 85,538)
Interest
(39,000)
( 31,410)
(37,000)
( 56,491)
Profit
(Loss)
(excl.
deprec.)
(23,000)
( 99,676)
3,500 (142,029)
Deprec.
(48,000)
( 69,354)
(45,000)
( 77,563)
Profit
(Loss)
after
interest
deprec.
(71,000)
(169,030)
(41,500)
(219,592)
1986
1987
Projection
Actual
Projection
Actual
Gross
Income
$ 63,000 $ 12,770 $ 119,000 $ 62,954 Expenses
(excl.
interest
and
deprec.)
(22,500)
(100,319)
( 28,000)
( 95,563)
Profit
(Loss) (excl.
interest
and
deprec.)
40,500 ( 87,549)
91,000 ( 32,609)
Interest
(37,000)
( 58,824)
( 35,000)
( 52,837)
Profit
(Loss)
(excl.
deprec.)
3,500 (146,373)
56,000 ( 85,446)
Deprec.
(45,000)
( 96,748)
( 43,000)
( 83,046)
Profit
(Loss)
after
interest
deprec.
(41,500)
(243,121)
13,000 (168,492)
*155 1988
Projection
Actual
Gross
Income
$ 124,000 $ 28,377 Expenses
(excl.
interest
and
deprec.)
( 85,500)
( 99,578)
Profit
(Loss) (excl.
interest
and
deprec.)
38,500 ( 71,201)
Interest
( 45,000)
( 87,564)
Profit
(Loss)
(excl.
deprec.)
( 6,500) (158,765)
Deprec.
( 75,000)
( 69,569)
Profit
(Loss)
after
interest
deprec.
( 81,500)
(228,334)
OPINION The issue we must decide is whether petitioners' appaloosa breeding activity constituted an activity "not engaged in for profit". Sec. 183(a). [10]
*156 An activity is engaged in for profit if the taxpayer has an "actual and honest objective of making a profit". Keanini v. Commissioner, 94 T.C. 41, 46 (1990). Although the expectation need not be reasonable, it must be shown that a bona fide profit objective did exist. Keanini v. Commissioner, supra at 46; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. Profit in this context means economic profit, independent of tax savings. Hulter v. Commissioner, 91 T.C. 371, 393 (1988). Whether petitioners engaged in their breeding activity with the requisite profit objective is a question of fact to be determined from all the facts and circumstances; petitioners have the burden of proof. Rule 142(a); Keanini v. Commissioner, supra at 46; Golanty v. Commissioner, supra at 426; sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., provides the following *157 list of factors to consider in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity (i.e., whether such activity is carried on in a businesslike manner); (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. No single factor is determinative, and the foregoing is only intended as a partial list of potentially relevant factors. Keanini v. Commissioner, supra at 47; Taube v. Commissioner, 88 T.C. 464, 479-480 (1987); sec. 1.183-2(b), Income Tax Regs. We see no need to discuss each of the factors set forth in the regulations; rather, we will deal with the entire record in the context *158 of the parties' arguments. See Taube v. Commissioner, supra at 489-481. Initially, petitioners contend that they had the requisite profit objective because KJ Appaloosas was conducted in a businesslike manner as reflected by: (1) Reliance on industry experts for advice; (2) timely changes in breeding and showing strategy; (3) cost reduction and revenue enhancement measures; (4) maintenance of proper business records; (5) use of advertising; (6) efforts to expand their knowledge in respect of breeding, showing, judging, and caring for horses; and finally, (7) the decision to liquidate KJ Appaloosas in 1989. Petitioners also point to the personal efforts they expended in the operation of KJ Appaloosas and to Mr. Smith's successful business ventures as evidence of their profit objective. Finally, petitioners explain their failure to realize their projections and their recurring losses by pointing to external factors over which they had no control. Respondent, on the other hand, contends that KJ Appaloosas was not a business entered into for profit, but was a foreseeable evolution of petitioners' prior involvement with pleasure horses. According *159 to respondent, the steady stream of losses incurred by KJ Appaloosas over the years, taken in conjunction with the manner in which petitioners conducted KJ Appaloosas, belies the existence of the requisite profit objective. First, we note that respondent does not dispute that petitioners sought advice from experts within the appaloosa industry, nor that petitioners acted upon such advice. Rather, respondent asserts that the advice of the experts was suspect because they had a financial interest in selling horses and training services to petitioners and further, that petitioners and their experts failed to discuss the financial aspects of breeding and showing appaloosas as applied to their situation. Having heard the testimony of two of the experts, we do not share respondent's suspicions as to their bias. We do share respondent's concerns as to the scope of the consultations because neither the testimony of the experts nor that of petitioners fleshes out, other than in a very general way, the matters discussed. Petitioners also showed their willingness to change their strategy if needed. For instance, although they initially decided to focus on the regional appaloosa market, *160 they realized at an early stage that it would be necessary to attain a national reputation to be a successful breeder and altered their breeding plan to include national quality breeding stock. In a similar vein, they reduced their participation in regional shows, retained national caliber trainers, and entered their horses in national and world shows. Petitioners made other changes which had a bearing on the financial aspects of their breeding activity. They constructed their own stable facility to reduce the cost of boarding their horses in Idaho Falls, although we are constrained to note that, at least in the short run, the interest, to say nothing of the principal, payments on the mortgage had a countervailing effect -- a factor which, as will subsequently appear, see infra pp. 25-26, had a significant bearing on the profit potential of the breeding operation. When the appaloosa industry experienced a downturn, and petitioners realized that a recovery was several years away, they discontinued their national advertising campaign, thus saving some $ 13,000 yearly. Petitioners also started growing their own hay to reduce feeding costs. At the same time, petitioners implemented *161 certain measures to generate additional revenues. They leased the unused portion of their stable facility, and an accompanying mobile home, to an outside quarter horse operation. In addition, they entered into an agreement with their trainer whereby their truck and trailer would be used to transport other breeders' horses to shows for a mileage fee whenever it was being used to transport petitioners' horses to such shows. Petitioners kept books and records in respect of the breeding operation. See supra p. 10. They maintained a separate bank account for KJ Appaloosas, as they did for each of the other businesses in which they were involved. Although the record does not disclose that written business plans were prepared by petitioners for the early stages of the operation, it is evident that they had a definite goal for KJ Appaloosas and charted a course of action which they believed would allow them to accomplish this goal. Their goal was to attain a national reputation for KJ Appaloosas. They purchased national quality mares which they bred to stallions of similar quality. They employed nationally known trainers and exhibited their horses in national and world shows. *162 Finally, they advertised in national appaloosa publications and promoted their horses to trainers and owners across the country. Petitioners attended seminars in respect of veterinary care, nutritional care, breeding, and the judging of horses, and read several pertinent appaloosa publications to educate themselves in horse-related matters. Finally, when it became apparent that the appaloosa industry was not going to recover as petitioners had hoped, and that KJ Appaloosas continued to sustain losses, they liquidated their operation. We next consider the amount of personal time and effort which petitioners expended in their breeding activity. See sec. 1.183-2(b)(3), Income Tax Regs. The details of petitioners' personal involvement, particularly those of Mrs. Smith, are set forth in our Findings of Fact. See supra pp. 9-10. While some of Mrs. Smith's chores, e.g., cleaning out stalls, were less than pleasurable, we are not prepared to conclude, on the record before us, that personal satisfaction was not a significant element in petitioners' continued horse-breeding activity. Petitioners also seek support for their position as to a profit objective from the fact that Mr. *163 Smith successfully operated several other businesses. However, we see few, if any, similarities between teaching C.P.A. review courses and operating a horse-breeding farm. Accordingly, we attach minimal significance to the success of Mr. Smith's other business activities. In several respects, the foregoing elements fall within the category of "trappings", see Golanty v. Commissioner, 72 T.C. at 430, and must be evaluated in the context of the bona fides of petitioners' expectation of profits. In making our evaluation, we look at the profit picture in respect of the years at issue in terms of prior actual and anticipated future operations as they appeared at those times; actual profits or losses in those and subsequent years have probative, although not determinative, significance in such evaluation. As we see it, the ultimate result herein turns upon the impact of the large accumulation of losses by 1985 [11] and the continued accumulation of such losses during the years at issue, including the possibility of recoupment. See Engdahl v. Commissioner, 72 T.C. 659, 669 (1979); Golanty v. Commissioner, 72 T.C. at 426-428; *164 Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(6), Income Tax Regs. Petitioners contend that, had they been able to continue KJ Appaloosas, they would have had an "opportunity to earn substantial ultimate profit". Conversely, respondent contends that the substantial losses incurred by KJ Appaloosas over the years indicate that KJ Appaloosas had little likelihood of ever making a profit, and furthermore, that there was no possibility of recouping earlier losses in future years. At the outset, we find the method which petitioners used to project *165 expected profits defective. That method was constructed in terms of a cash-flow calculation which did not take into account interest or depreciation (or, for that matter, the annual payments of principal on the 10-year mortgage). As Mr. Smith explained, petitioners proceeded on the assumption that the tax savings would cover the costs of servicing the debt both as to interest and principal, and that depreciation would be recouped from the maintenance, or appreciation in value, of the stable facility; therefore, interest and depreciation could be ignored. On this basis, by the end of 1983, petitioners projected a cash-flow loss of $ 11,800 for 1983 and cash-flow profits of $ 16,000 for 1984, $ 40,500 for each of 1985 and 1986, and $ 91,000 for 1987. While tax benefits do not enter into the calculation of "economic profit" embodied in the cases dealing with section 183, that calculation does require that items entering into the determination of profit or loss for tax purposes, i.e., depreciation and interest, be taken into account. Not only can tax benefits not be used to turn a loss into an economic profit, but neither can they be used to reduce the amount of a loss for the purpose *166 of determining the existence of a profit objective. Indeed, we fail to understand how interest, which involves an out-of-pocket expenditure, can be ignored in a cash-flow analysis. In any event, as petitioners' own projections show, the calculation of profit or loss, after taking interest and depreciation into account, produced anticipated losses of $ 41,800 for 1983, $ 71,000 for 1984, and $ 41,500 for each of 1985 and 1986, and a profit of $ 13,000 for 1987. Perhaps of even greater significance are the huge discrepancies between petitioners' projected results and what actually happened in respect of revenues and expenses not including interest or depreciation. See supra p. 15. In this connection, we think it significant that such discrepancies exist even though they are attributable in part to unexpected events. Those discrepancies cast considerable doubt about the bona fides of petitioners' projections, which in turn, undermines the bona fides of petitioners' expectation of profit. Finally, even on the basis of petitioners' calculations on brief, of what the profit and loss picture of KJ Appaloosas would have been for the years in issue if the unanticipated events which *167 affected its revenues had not occurred and if depreciation and interest are taken into account, substantial losses would have still occurred -- $ 174,594 loss for 1985, $ 132,213 loss for 1986, $ 11,473 loss for 1987, and a $ 77,500 profit for 1988 and beyond. The foregoing reflects that, from the beginning, and without regard to the unanticipated events of 1984 and 1985, petitioners anticipated substantial losses. They apparently avoided accepting the reality of their situation by adopting a two-pronged approach to profit: (1) Petitioners considered the stable facility a completely separate element from their breeding activities and looked only at those activities to determine anticipated profits and losses. To be sure, on brief, they contend that, in determining the existence of a profit objective, we should take into account their claim that they anticipated the stable facility to appreciate in value. But the fact of the matter is that the record does not support their claim that any such appreciation (much less the amount thereof) could have been anticipated. In this connection, we note, at this point, that the same deficiency in the record exists with respect to petitioners' *168 claim that they anticipated that their brood mares would appreciate in value. Thus, the element of potential asset appreciation recognized by the decided cases, e.g., Engdahl v. Commissioner, 72 T.C. at 668-669, has no application herein. In any event, it is clear to us that the stable facility was an integral part of KJ Appaloosas' operations and that, from 1983 on, the economic burden of that facility would seriously impair the profitability of the breeding activities. (2) Despite a generalized statement by Mr. Smith at trial about the possibility of recouping prior losses, it is clear that petitioners' concept of profitability was confined to the realization of a profit on a yearly basis without regard to whether that profit would be sufficient to enable them to recoup prior losses. Moreover, it is obvious that those losses were so substantial that it was at best speculative as to when that recoupment could occur. Thus, even on the basis of petitioners' projections in 1983, and taking into account actual losses for 1981 and 1982, there were anticipated cumulative losses of some $ 250,000 [12] before a profit of $ 13,000 in 1987 could be realized; *169 at the latter rate, it would take almost 20 years to recoup those losses. By the end of 1983, the actual cumulative loss exceeded their projection by $ 53,576 ($ 95,376 - $ 41,800), by the end of 1984, it had increased by another $ 98,030 ($ 169,030 - $ 71,000), and by the end of 1985, by another $ 178,092 ($ 219,592 - $ 41,500). And if we take petitioners' adjustments to the actual figures in order to take into account the unforeseen events, see supra pp. 11-12, by the time the first profitable year could have been expected, namely 1988, the cumulative losses had become $ 636,097. [13] At the $ 77,500 annual profit projected for 1988, it would take in excess of 8 more years to recoup those losses. *170 Petitioners' position is set forth in the following quotation from their brief and confirms our view that they had only a peripheral concern for recouping prior losses: Accordingly, Petitioners could reasonably have anticipated that beginning in 1988 KJ Appaloosas would produce a growing profit, which at Petitioners' ages would have been more than adequate to recoup prior losses in the remaining years of the business. The nub of petitioners' position is that accumulated losses are no sin, no matter how large, if one suffers them young enough to have a sufficient life expectancy to recoup them. We consider such a position beyond the bounds of risk taking and speculative anticipation which are recognized as appropriate elements to be taken into account in determining the existence of a profit objective. In any event, leaving aside the question of the level of significance to be accorded to the possibility of recouping earlier losses, the analysis previously set forth indicates a record of losses of such a magnitude as to cast serious doubt on the existence of a profit objective on the part of petitioners herein. Petitioners have not overcome that doubt or persuaded us that they *171 otherwise meet the dominant motive standard for a profit objective under section 183 adopted by the Court of Appeals for the Ninth Circuit to which an appeal in this case lies. See Skeen v. Commissioner, 864 F.2d 93, 94 (9th Cir. 1988), affg. 88 T.C. 1086 (1987); see also Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Given petitioners' approach, which clearly encompassed tax benefits in their plan to acquire the stable facility, their substantial income level, and the continued presence of huge losses of KJ Appaloosas, our evaluation of both the written materials and the testimony of the witnesses whom we saw and heard, we conclude that petitioners did not have the requisite profit objective during the years at issue. Decision will be entered for respondent. Footnotes
1. Resolution of this issue will determine whether petitioners had a net operating loss of (1) $ 99,841 in 1985 which may be carried back to 1982 and (2) $ 24,337 in 1986 which may be carried over to 1987.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code as in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Petitioners were married in 1967 and divorced in 1990.↩
4. One such business, Excel Learning Systems, is wholly owned by Mr. Smith. The other business, Accounting Institute Seminars, is jointly owned by Mr. Smith and another C.P.A. Both have been profitable throughout their approximately 20 year existence. Mr. Smith also owns a business known as the Paperwork Place which provides printing and copying services to the general public and printing and administrative services to petitioners' other businesses.↩
5. During the formative stages of KJ Appaloosas, petitioners also consulted with various clients of Mr. DeRoche who were involved in the appaloosa business.↩
6. Mr. Eklund, who has been in the appaloosa business since 1970, served on the boards of appaloosa organizations both at the regional level, as president of the Sagebrush Circuit for 10 years, and at the national level, as a national director of the Appaloosa Horse Club. He has shown appaloosas at the national level since approximately 1973. One of Mr. Eklund's stallions, The Executive, has sired 37 different national and world champions.↩
7. Appaloosas considered to be of a national quality (i.e., of a quality which would enable them to compete successfully in national and world shows) were sold at a minimum of $ 10,000 to $ 25,000, and often in a range of up to $ 65,000. The original mares petitioners purchased in 1981, on the other hand, were considered to be of a regional or local quality, and only worth between $ 2,000 and $ 8,000.↩
8. With the purchase of said offspring from The Executive, it was petitioners' intention "to offer and to develop The Executive line within the northwestern United States", which would provide KJ Appaloosas with a presence in the national breeding community.↩
9. Not including the exchange of several horses for veterinary services, approximately $ 42,000 of sales claimed by petitioners were horse-for-horse exchanges.↩
1. Petitioners also deducted capital losses of $ 638.↩
2. Petitioners also deducted a loss of $ 53,298 attributable to Excel Learning Systems.↩
3. This amount offset petitioners' reported adjusted gross income.↩
4. Petitioners also deducted capital losses of $ 3,000.↩
10. Sec. 183(a) provides: (a) General Rule. -- In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. Sec. 183(c) defines an activity "not engaged in for profit" as follows: (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
11. We note that losses during the startup period of an activity are not necessarily fatal. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979); Trafficante v. Commissioner, T.C. Memo. 1990-353; Kaehn v. Commissioner, T.C. Memo. 1987-608; sec. 1.183-2(b)(6), Income Tax Regs.↩
12. Such amount is composed of losses of $ 12,522 for 1981, $ 40,889 for 1982, $ 41,800 in 1983, $ 71,000 for 1984, $ 41,500 each for 1985 and 1986.↩
13. Such amount is composed of losses of $ 12,522 for 1981, $ 40,889 for 1982, $ 95,376 for 1983, $ 169,030 for 1984, $ 174,594 for 1985, $ 132,213 for 1986, and $ 11,473 for 1987.↩