# United States Tax Court

T.C. Memo. 2026-15

KENWARD F. KOLAR, JR.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 5482-19.                              Filed February 9, 2026.

_____

*Virgil E. Vickery* and *Stephen M. Klecka*, for petitioner.

*Daniel C. Brauweiler* and *Christina D. Sullivan*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WAY, *Judge*: In a Notice of Deficiency dated December 24, 2018, the Internal Revenue Service (respondent) determined the following deficiency and additions to tax for petitioner Kenward F. Kolar, Jr.'s 2016 tax year:

| Year | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | § 6651(a)(1)[1] | § 6651(a)(2) | § 6654(a) |
| 2016 | $292,247 | $54,467.32 | $29,049.24 | $5,653.35 |

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*2]** Petitioner has conceded the unreported gross income adjustment of $828,925 in the Notice of Deficiency, and the parties have agreed to offsetting expense amounts totaling $146,191 for 2016. Petitioner has also conceded that he is liable for additions to tax under sections 6651(a)(1) and (2) and 6654.

After these concessions, the sole remaining issue is whether section 183, concerning activities not engaged in for profit, limits the deductibility of an additional $205,514 of farm expenses petitioner incurred for 2016. Finding that section 183 does not, the Court rules in favor of petitioner on this issue.

FINDINGS OF FACT

The parties have stipulated some facts, which are so found. The Stipulation of Settled Issues is incorporated herein by this reference. In addition, the parties' stipulations concerning certain farm expenses read into the record during the trial in this case are also herein incorporated. Mr. Kolar lived in the State of Texas when he timely filed his Petition.[2]

I.    *History of Mr. Kolar's Ranch*

Mr. Kolar's ranch (Kolar ranch) was first purchased by ancestors of Mr. Kolar in the late 1800s. The Kolar ranch is composed of multiple, noncontiguous tracts of land in south central Texas between Houston and San Antonio. In total the Kolar ranch spans approximately 836 acres. Mr. Kolar, his wife Rhonda Kolar, and, before their deaths, his parents, at various times owned, operated, managed, or otherwise worked on the Kolar ranch and participated in its various enterprises.

Throughout its long history, the Kolar ranch's ventures have included agricultural and nonagricultural operations. On the agricultural side the Kolar ranch maintained dairy cattle, beef cattle, egg and poultry production, catfish raised in tanks, hay crop production, and a pecan orchard. The Kolar ranch began its dairy venture in the late 1950s. It took Mr. Kolar's parents several years to develop the dairy cows, but eventually the Kolars were milking approximately 600 dairy cows twice a day. Because of increased competition and regulatory burdens, the Kolar ranch ceased its dairy operation sometime in the

---

[2] Unless otherwise agreed by the parties in writing, venue for an appeal is the U.S. Court of Appeals for the Fifth Circuit. *See* § 7482(b)(1)(A), (2).

**[\*3]** 1990s. More recently the sale of Kolar ranch mineral rights has been an important stream of revenue.

II.     *Mr. Kolar's Education and Early Work on the Kolar Ranch*

Mr. Kolar lived on or near the Kolar ranch for most of his life. Mr. Kolar received his bachelor's degree in animal science and biology from Texas A&M University and a master's degree in water supply and wastewater disposal from Sam Houston State University. At some point after college, Mr. Kolar returned to work the Kolar ranch with his father, although, at that time, Mr. Kolar did not own or manage the ranching operation.

At some point in the late 1990s, Mr. Kolar's father became chronically ill with cancer and eventually passed away in 2010. After his father's death, Mr. Kolar became owner of the Kolar ranch land while Mr. Kolar's mother inherited the financial assets associated with the Kolar ranch and managed ranch operations. Within a few years Mr. Kolar's mother would also fall ill. By 2016 she had become totally blind and mentally disabled. At that point, Mr. Kolar took over management of the Kolar ranch. His mother passed away in 2017. Upon her death, Mr. Kolar took full ownership of the Kolar ranch's various enterprises and financial assets.

III.    *The Kolar Ranch Under Mr. Kolar's Management*

Mr. Kolar married Rhonda Kolar in 2013 or 2014, at the age of 62, and they had a son in 2014. They all lived together on the Kolar ranch. Mr. Kolar did not have siblings and was the sole heir to his parent's estate.

In 2016, while his mother was infirm, Mr. Kolar managed and operated the Kolar ranch. By this time, because of his father's prolonged illness and his mother's inability to properly manage the Kolar ranch in her elder years, the Kolar ranch had fallen into disrepair. Upon taking over, Mr. Kolar needed to restore much of the Kolar ranch's infrastructure; he needed to restore fences, replace old equipment, clear overgrown pastures, and rebuild the livestock herd, starting with beef cattle.

By 2016 portions of the Kolar ranch had become overgrown with huisache, a small, thorny bush-like tree that had made vast tracts unusable for raising cattle and other endeavors. Mr. Kolar had to clear the land of this nuisance tree.

**[\*4]**    Even after clearing the land and restoring the Kolar ranch's physical infrastructure, breeding a sustainable and profitable beef cattle herd (as opposed to buying and bringing in mature, market-ready cattle) can take many years. At the time he began managing the Kolar ranch, Mr. Kolar anticipated that returning the cattle-raising portion of the Kolar ranch to profitability would take five to six years.

Mr. Kolar worked long hours every day of the week on the Kolar ranch. He did not have time to attend cattle shows or similar ranching-related recreational activities, although he had participated in rodeos as a younger man.

Mr. Kolar's goal was to increase his herd size to around 250 head of cattle, potentially worth over several hundred thousand dollars at current prices. He believed the herd size could be increased even further if his son eventually took over the ranching operation. Mr. Kolar felt sentimentally attached to the Kolar ranch and desired that his son eventually take over.

During this period, Mrs. Kolar served as the bookkeeper for the Kolar ranch and kept records that the couple would report to their certified public accountant. The Kolar ranch had a checking account for ranch operations that was separate from the account used by Mr. and Mrs. Kolar for their household expenses. Mrs. Kolar had a multistep recordkeeping process. She maintained a check register along with a "category" book for recording daily income and expenses. She also had a "weekly book" which she would prepare and use to go over the numbers with Mr. Kolar. She then prepared a monthly Excel spreadsheet and a final yearend spreadsheet documenting Kolar ranch income and expenses. In addition to her bookkeeping duties and family obligations, Mrs. Kolar had two pet horses that she cared for and rode.

The Kolar ranch offered sources of revenue beyond its agricultural activities. One significant source of nonagricultural revenue consisted of rents and royalties paid by oil and gas companies for extracting oil and gas from the Kolar ranch. From 2017 through 2022, Mr. Kolar reported royalty income of $2,349,780.

The Kolar ranch also sold water extracted from artesian wells on the property. Not all the water from these wells was sold. Some of it was used to provide potable water to the Kolar ranch's cattle herd and to irrigate pastures upon which that herd could graze. In 2016 and 2017 Mr. Kolar was able to generate revenue by selling Kolar ranch well

[*5] water. He sold water to the oil companies working on the Kolar ranch and to neighboring properties that grew and harvested pecan trees. Income from these water sales ranged from $500 to $40,000.

## IV.    *Casualty Events That Affected the Kolar Ranch*

The cattle industry is cyclical and subject to droughts and other adverse weather events. In 2017 Hurricane Harvey hit the Gulf States, including portions of southern Texas, causing the destruction of many, but not all, of the Kolar ranch's books and records.

In 2020 the COVID–19 pandemic had a significant impact on Mr. Kolar's life and his burgeoning cattle ranch activity. Three out of five Kolar ranch employees died from COVID–19. In February 2021 the State of Texas suffered a severe winter storm. The Kolar ranch lost electricity for two and a half weeks. The Kolar ranch's water wells froze and burst their pipes, eliminating a primary source of water for the cattle. Many cows died from thirst. Around this time, the Kolar ranch's operations were also adversely affected by fire, droughts, grasshoppers, and floods.

These setbacks did not entirely upend the operation, which continued to raise and sell cattle in limited numbers. From 2016 through 2020 the price of cattle varied greatly, depending on market conditions and the quality of the cattle being sold. Prices could range from a low of $0.34 per pound to a high of $1.50, with cattle generally ranging in size from 750 to 1,600 pounds. In 2021 Mr. Kolar sold 15 head of cattle.

OPINION

## I.    *Jurisdiction and Burden of Proof*

The Court has jurisdiction to resolve this case under section 6213(a). The Commissioner's determinations set forth in a Notice of Deficiency are generally presumed correct, and taxpayers bear the burden of showing that the determinations are in error. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Tax deductions are a matter of legislative grace, and taxpayers bear the burden of proving entitlement to any deduction. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Ultimately, though, the burden of proof rests with the taxpayer to show that expenses were in furtherance of a business and not of a personal nature. *See Welch v. Helvering*, 290 U.S. at 115.

**[\*6]** We decide the factual issues on the preponderance of the evidence, and we need not decide which party has the burden of proof. *Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340.

II.   *Analysis: Section 183 Limitation on Activities Not Engaged In for Profit*

Regarding the deficiency determination, the sole issue remaining for the Court's decision is whether Mr. Kolar's farming and ranching expenses for the 2016 tax year should be allowed as deductions in amounts greater than those respondent has already allowed. The Court notes that neither substantiation of the expenses nor their attribution to the Kolar ranch is at issue. The parties' disagreement instead concerns only whether Mr. Kolar engaged in ranching and related activities for profit in 2016. We conclude by a preponderance of the evidence that he did.

The Court's discussion proceeds in three parts. First, we briefly provide some legal background. Second, we ascertain the activity at issue. Finally, we consider whether Mr. Kolar engaged in ranching and related activities for profit in 2016 within the meaning of section 183.

A.   *Background*

Taxpayers are generally allowed deductions for business-related expenses and for expenses paid or incurred for the production or collection of income. §§ 162, 212. Section 183, however, limits such deductions in the case of an activity engaged in by an individual or an S corporation that is not engaged in for profit, except (1) where such deductions would be allowed without regard to whether the activity was engaged in for profit or (2) to the extent that the gross income from such activity exceeds the deductions allowable without regard to profit motive. § 183(b); Treas. Reg. § 1.183-1(a) and (b); Treas. Reg. § 1.183-2(a) ("Thus, for example, deductions are not allowable under section 162 or 212 for activities which are carried on primarily as a sport, hobby, or for recreation.").

B.   *Ascertaining the Activity at Issue*

To determine whether a taxpayer had an intent to make a profit, the activity at issue must first be ascertained. Treas. Reg. § 1.183-1(d)(1). Where a taxpayer is engaged in several undertakings, each may be a separate activity. *Id.* A taxpayer's multiple undertakings may be

**[\*7]** treated as one activity if the undertakings are sufficiently interconnected. *Welch v. Commissioner*, T.C. Memo. 2017-229, at \*22 (citing Treas. Reg. § 1.183-1(d)).

The Commissioner will generally accept the taxpayer's characterization of multiple undertakings as either a single activity or separate activities. Treas. Reg. § 1.183-1(d)(1). The taxpayer's characterization will not be accepted, however, when it appears that it is artificial and cannot be reasonably supported by the facts and circumstances of the case. *Id.* "In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account."[3] *Id.*

Regarding the Kolar ranch, the Court concludes that ranching activity is the relevant "activity" for purposes of applying section 183. Respondent argues that the relevant activity is the cattle ranch activity. Petitioner objects to this description as overly narrow, taking the position that the relevant Kolar ranch activity extends beyond the cattle ranch activity to include land appreciation and other related undertakings. Petitioner would have the Court include among related undertakings the exploitation of oil and gas resources on the Kolar ranch, since according to petitioner, the roads, the fences, and the other improvements served both the cattle ranch business and the mineral exploitation business.

Considering all the facts and circumstances, the Court concludes that ranching activity generally, not including land appreciation and oil and gas exploitation, is the activity to which the section 183 test is

---

[3] Generally, the most significant facts and circumstances to consider when ascertaining the activity at issue are the degree of organizational and economic interrelationship of the undertakings, the business purpose that is (or might be) served by carrying on the undertakings separately or together, and the similarity of the undertakings. Treas. Reg. § 1.183-1(d)(1). Other factors for consideration include

> (1) whether the undertakings were conducted at the same place, (2) whether the undertakings were part of the taxpayer's efforts to find sources of revenue from their land, (3) whether the undertakings were formed separately, (4) whether one undertaking benefited from the other, (5) whether the taxpayer used one undertaking to advertise the other, (6) the degree to which the undertakings shared management, (7) the degree to which one caretaker oversaw the assets of both undertakings, (8) whether the same accountant was used for the undertakings, and (9) the degree to which the undertakings shared books and records.

*Young v. Commissioner*, T.C. Memo. 2025-95, at \*20–21.

[*8] appropriately applied. For land appreciation to be grouped with ranching activity for purposes of the section 183 limitation, as petitioner asserts, the ranching activity would need to be independently profitable, excluding deductions relating to holding the property (such as rent and depreciation of improvements to real property), such that the ranching activity supports the holding of the land for appreciation. *See* Treas. Reg. § 1.183-1(d)(1); *see also Young*, T.C. Memo. 2025-95, at *22. That was not the case with respect to the Kolar ranch, given that the ranching activity for the year at issue was not profitable.

The Court also considers the royalty income earned for the extraction of oil and gas from the Kolar ranch to be a separate activity. Other than geographic proximity, oil and gas extraction is a fundamentally different enterprise from cattle ranching. The fact that both activities share some roads and fences is insufficient for them to be combined for purposes of applying the section 183 limitation. The Court nevertheless agrees with petitioner that the ranching activity at issue extends beyond just cattle ranching and includes the development of well water on the Kolar ranch that, while generating some separate revenue, was used to provide potable water to the cattle herd.

C.     *Activity Not Engaged In for Profit Defined*

The Court must now consider whether Mr. Kolar's 2016 ranching activity was an activity engaged in for profit. *See* Treas. Reg. § 1.183-2(a) (requiring a determination of whether "the facts and circumstances . . . indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit"); *see also Young*, T.C. Memo. 2025-95, at *25. An activity is engaged in for profit if the taxpayer entertained an actual and honest profit objective at the time. Treas. Reg. § 1.183-2(a); *see also, e.g.*, *Westbrook v. Commissioner*, 68 F.3d 868, 875 (5th Cir. 1995), *aff'g per curiam* T.C. Memo. 1993-634; *Dreicer v. Commissioner*, 78 T.C. 642, 644–45 (1982), *aff'd*, 702 F.2d 1205 (D.C. Cir. 1983) (unpublished table decision).

While "a reasonable expectation of profit is not required," the taxpayer's profit objective must be "bona fide." *Dreicer*, 78 T.C. at 644–45. Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. Treas. Reg. § 1.183-2(a) and (b); *see, e.g.*, *Keanini v. Commissioner*, 94 T.C. 41, 46–47 (1990) (explaining that the factors are in large part a synthesis of prior case law). Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Treas. Reg. § 1.183-2(a); *see also, e.g.*, *Thomas v.*

**[\*9]** *Commissioner*, 84 T.C. 1244, 1269 (1985), *aff'd*, 792 F.2d 1256 (4th Cir. 1986).

Treasury Regulation § 1.183-2(b) provides a nonexhaustive list of nine factors that should be considered: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. "No one factor is determinative," and it is not intended that "a determination . . . be made on the basis that the number of factors . . . indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa." *Id.*

Evidence from years outside the year at issue can be relevant if it provides context to evaluate the taxpayer's requisite profit motive. *Himmel v. Commissioner*, T.C. Memo. 2025-35, at \*12; *Den Besten v. Commissioner*, T.C. Memo. 2019-154, at \*18. The focus of the inquiry remains on the year at issue and the anticipated future operations, as they appeared at that time. *Smith v. Commissioner*, T.C. Memo. 1993-140, 65 T.C.M. (CCH) 2289, 2296. Actual profits and losses from subsequent years, however, have probative value. *Id.*

1. *Manner in Which the Taxpayer Carries On the Activity*

A profit motive may find support where a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records. Treas. Reg. § 1.183-2(b)(1). Similarly, a profit motive may be indicated where an activity is carried on in a manner substantially similar to other activities of the same nature that are profitable. *Id.* Another indication of a profit motive can include the abandonment of unprofitable methods or the adoption of new techniques in a manner consistent with an intent to improve profitability. *Id.* Characteristics of a businesslike operation include the preparation of a business plan. *Mathis v. Commissioner*, T.C. Memo. 2013-294, at \*9 (citing *Bronson v. Commissioner*, T.C. Memo. 2012-17, *aff'd*, 591 F. App'x 625 (9th Cir. 2015)).

[*10] The Court concludes that Mr. Kolar operated the Kolar ranch in a businesslike manner. The Kolar ranch had a checking account for ranch operations that was separate from the account used by Mr. and Mrs. Kolar for their household expenses. In addition, as the Kolar ranch bookkeeper, Mrs. Kolar had a multistep recordkeeping process. She maintained a check register along with a "category" book for recording daily income and expenses. She also had a "weekly book" which she would prepare and use to go over the numbers with Mr. Kolar. She then prepared a monthly Excel spreadsheet and a final yearend spreadsheet documenting the Kolar ranch's income and expenses.

Respondent contends that there is no indication in the record that any financial statements or other formal books of account had ever been prepared with respect to the Kolar ranch. Respondent further notes that the record does not include any spreadsheets evaluating the Kolar ranch's profitability. Citing *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947), respondent contends that the absence from the record of any financial statements, books of account, and other evidence of the Kolar ranch's profitability indicates that those records would not have been favorable to Mr. Kolar.

The lack of records would indeed be troubling but for the fact that respondent's counsel reviewed at least two Kolar ranch ledgers during a court-ordered recess from the trial specifically for that purpose. After this recess, the parties agreed to mutual concessions and stipulated to numerous Kolar ranch expenses. Moreover, Mrs. Kolar credibly testified about her recordkeeping process and identified under oath the two ledgers that were subsequently reviewed by respondent's counsel (although not offered into evidence). Given the breadth of the parties' mutual concessions and stipulations, the Court does not fault petitioner for omitting the underlying records from the Court record.

Respondent contends that the lack of a business plan is also indicative of the lack of a profit motive. Although Mr. Kolar did not have a written business plan, he clearly had a plan to increase his cattle herd over time that included buying and breeding cattle. Respondent argues that Mr. Kolar's informal ideas did not constitute a business plan but rather what Mr. Kolar hoped would come true.

The Court finds Mr. Kolar's testimony regarding the steps he intended to undertake with respect to the Kolar ranch credible and the steps themselves sufficient to constitute a business plan. Mr. Kolar had

[*11] worked on the Kolar ranch for many years before he came to run it, including during periods when the Kolar ranch was a profitable going concern. His strategy for running the Kolar ranch was consistent with his well-founded understanding of what it would take to make the ranch profitable.

The Court views this factor as supporting a profit motive.

### 2.     *Expertise of the Taxpayer*

Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with experts, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Treas. Reg. § 1.183-2(b)(2). Where a taxpayer has such preparation or procures such expert advice but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity. *Id.*

Mr. Kolar had decades of experience working on the Kolar ranch before he came to operate it. In addition, he has a bachelor's degree in animal science and biology from Texas A&M University and a master's degree in water supply and wastewater disposal from Sam Houston State University.

Respondent concedes that Mr. Kolar knew a lot about caring for cattle day to day but argues that Mr. Kolar failed to develop expertise in the economics of the cattle business or hire any consultants to assist him in doing so. We do not find this argument persuasive. Mr. Kolar testified at length about the prices of various types of cattle and which cattle markets offered the best prices. This credible testimony revealed that his expertise was not just in the raising of livestock but also in their marketing and sale.

The Court views this factor as supporting a profit motive.

### 3.     *Time and Effort Expended Pursuing the Activity*

The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. Treas. Reg. § 1.183-2(b)(3). A taxpayer's withdrawal from another occupation to devote most of his energies to the

**[\*12]** activity may also be evidence that the activity is engaged in for profit. *Id.*

For many years Mr. Kolar's full-time occupation has been managing and working on the Kolar ranch. This includes the year at issue and all the subsequent years leading up to trial in this case. Mr. Kolar credibly testified about the long hours he spent caring for his cattle herd and working to improve the Kolar ranch. Mr. Kolar was not a cattle ranch dilettante; he had been working on the Kolar ranch most of his life.

The Court views this factor as supporting a profit motive.

4. *Expectation That Assets Used in the Activity May Appreciate in Value*

The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Treas. Reg. § 1.183-2(b)(4). Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. *Id.*

The Court concluded earlier that the activity at issue in this case consisted of ranching activity and not the appreciation of the Kolar ranch itself or the exploitation of oil and gas reserves. Although Mr. Kolar intended to increase the size of his herd and improve the Kolar ranch such that it could sustain a larger herd, that activity is conceptually different from holding an asset for appreciation.

Consequently, the Court takes a neutral view as to this factor's implications with respect to a profit motive.

5. *Success of the Taxpayer in Carrying on Similar and Dissimilar Activities*

The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Treas. Reg. § 1.183-2(b)(5). Similarly, a taxpayer's success in other ventures may indicate the necessary entrepreneurial skills and intent to succeed in the endeavor

**[\*13]** under scrutiny and therefore support the finding of a profit motive. *Den Besten*, T.C. Memo. 2019-154, at \*29–30.

Petitioner contends that both his converting an oil and gas dry hole into a functioning water well, from which he has sold water, and his rental real estate each demonstrate his previous success and support a profit motive. However, the record lacks evidence to support that contention. Moreover, the activities are dissimilar to ranching, and there is no basis for extrapolating success in those activities to ranching.

Consequently, the Court takes a neutral view as to this factor's implications with respect to a profit motive.

6.      *Taxpayer's History of Income and Losses*

A series of losses during the initial or start-up phase of an activity may not necessarily be an indication that the activity is not engaged in for profit. Treas. Reg. § 1.183-2(b)(6). However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. *Id.*

If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. *Id.* A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit. *Id.*

The Kolar ranch had significant losses during the year at issue and in subsequent years. Respondent emphasizes on brief that Mr. Kolar reported substantial losses between 2017 and 2022, with reported gross receipts during that period of just $25,874 compared with reported losses in excess of $2 million. Petitioner contends that these losses were attributable to reinvestment into a degraded ranch, the length of time necessary to restore the cattle herd, and unforeseen casualty events. Mr. Kolar credibly testified that it would take five or six years to restore the Kolar ranch and grow the cattle herd to a sustainable size. Bad weather, including freezes and droughts, along with the COVID–19 pandemic in 2020, all affected this timeline to profitability.

**[\*14]** The size of Mr. Kolar's reported losses relative to gross receipts is troublingly large. The Court, however, finds Mr. Kolar's explanation plausible, including the length of time required to restore the Kolar ranch and develop a sustainable herd, combined with unforeseeable setbacks. On net, this factor weighs slightly against a finding of a profit motive.

### 7.  *Amount of Occasional Profits Earned*

The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. Treas. Reg. § 1.183-2(b)(7). An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. *Id.* However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. *Id.* Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. *Id.*

As discussed in the analysis of the last factor, over a multiyear period Mr. Kolar's ranching activities generated only limited gross receipts offset by significant losses. As with the last factor, this factor weighs slightly against a finding of a profit motive.

### 8.  *The Financial Status of the Taxpayer*

The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Treas. Reg. § 1.183-2(b)(8). Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. *Id.* However, tax benefits resulting from the activity do not compel a conclusion that a taxpayer engaged in an activity without a profit objective, and the inquiry should focus on whether the taxpayer had a genuine profit objective. *Den Besten*, T.C. Memo. 2019-154, at \*34.

[*15] Mr. Kolar indeed had substantial income from a nonranching activity, specifically from oil and gas royalties generated by the Kolar ranch. Mr. Kolar contends that the Kolar ranch is a single unitary business and that, taken as a whole, the Kolar ranch operation cannot be viewed as lacking a profit motive. As discussed earlier, the Court views Mr. Kolar's ranching activity as separate and distinct from the activities that produce oil and gas royalties. Consequently, the Court disagrees with his position in this regard and views this factor as weighing against a finding of a profit motive.

### 9. *Elements of Personal Pleasure or Recreation*

The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Treas. Reg. § 1.183-2(b)(9). On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. *Id.* However, an activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. *Id.* The fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors. *Id.*

Mr. Kolar works very long hours on the Kolar ranch. His physical appearance and demeanor at trial did not suggest he was a hobbyist who enjoyed recreational ranching. When scheduling trial days he credibly expressed concern that he had to be back to tend to his cattle herd. Although Mr. Kolar had participated in rodeos as a younger man, he no longer does that or has time to attend cattle shows or similar ranching-related recreational activities.

Respondent argues in support of a recreational rather than a profit motive that Mrs. Kolar enjoys riding and working with horses. We do not find this argument persuasive. Mr. Kolar credibly testified that the two horses Mrs. Kolar enjoys riding are treated as pets, and consequently, we do not view enjoyment of them as relevant to our analysis of Mr. Kolar's ranching activities.

Respondent also argues that Mr. Kolar's son participates in ranching activity and that Mr. Kolar derives pleasure from being able to bond with his son in this way. We do not find this argument compelling. Mr. Kolar's son was two years old during the year at issue, so it is

**[\*16]** unlikely that he participated in ranching activity in any meaningful way during that year. Moreover, we do not view training one's children to farm and ranch in the hope that they will one day take over the family business as inconsistent with a profit motive. Indeed, it is often the case that family members, including older minor children, participate in the running of profitable small businesses. Viewed in this light, Mr. Kolar's decision to have his son participate in ranching activities supports a profit motive.

The Court views this factor as weighing in favor of a profit motive.

III.   *Conclusion*

Of the nine factors listed in Treasury Regulation § 1.183-2(b), four factors favor petitioner, two are neutral, and three weigh against a profit motive. However, as discussed earlier, reaching a decision involves more than simply tallying the factors for and against; a qualitative analysis is required. In the Court's view, the factors in favor of a profit motive outweigh those against. Petitioner has provided credible explanations justifying the lengthy startup period and long path to profitability.

In the Court's view, the largest factor weighing against a profit motive is the financial status of Mr. Kolar. The fact that Mr. Kolar had substantial oil and gas royalty income which could be offset by ranching losses weighs against a profit motive. However, this factor simply does not outweigh the other factors in favor of a profit motive. Consequently, the Court concludes that, for 2016, the section 183 limitation on activity not engaged in for profit does not apply to petitioner's ranching activities.

The Court has considered all of the parties' arguments and, to the extent they are not discussed herein, finds them to be irrelevant, moot, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*