T.C. Memo. 2019-71

UNITED STATES TAX COURT

JAMES P. DONOGHUE AND ELAINE S. DONOGHUE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3126-15.                 Filed June 11, 2019.

James P. Donoghue and Elaine S. Donoghue, pro sese.

Derek W. Kelley, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, Judge: Beginning in 1985 petitioners engaged in a thoroughbred horse breeding and racing activity. They continued to engage in the activity until 2014 despite reporting a loss for every year of its existence. Respondent audited petitioners' joint Forms 1040, U.S. Individual Income Tax Return, for taxable years 2010, 2011, and 2012 (years at issue) and determined

[*2] that the loss deductions they claimed related to their horse activity should be disallowed.[1] Consequently, by statutory notice of deficiency dated November 20, 2014, respondent determined deficiencies in petitioners' Federal income tax and accuracy-related penalties pursuant to section 6662(a)[2] for the years at issue as follows:

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|----------------------------------------|
| 2010 | $8,491    | $1,698 |
| 2011 | 9,316     | 1,863  |
| 2012 | 10,353    | 2,071  |

The issues for decision are whether for the years at issue petitioners (1) engaged in their horse activity for profit within the meaning of section 183(a) and (2) are liable for accuracy-related penalties. We resolve both issues in favor of respondent.

---

[1]Respondent also determined that petitioners had unreported short-term capital gain on the sale of certain securities for each of the years at issue. The parties now agree that petitioners had unreported long-term (rather than short-term) capital gain for each of the years at issue. Respondent also made a computational adjustment to the taxable amount of Social Security benefits petitioners reported for each of the years at issue.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

[*3]                           FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulation of facts and attached exhibits are incorporated herein by this reference.  Petitioners resided in Massachusetts when they timely filed their petition with the Court.

## I.    Petitioners' Background

During the years at issue Mr. Donoghue worked full time for W.B. Mason Co., Inc., as a programmer and Mrs. Donoghue was disabled.  Mr. Donoghue has also previously managed a family construction business, and Mrs. Donoghue has been a paralegal and an executive in various departments of a corporation.  They both have college degrees--Mr. Donoghue in finance with a minor in business and Mrs. Donoghue in communication arts.

## II.    Petitioners' Horse Activity

Mrs. Donoghue fell in love with horses as a child, attributing this to her grandfather, who was a successful breeder of thoroughbred racing horses and frequently took her to racetracks and breeding farms when she was young.  As she grew older, she fell in love with the business he ran and she diligently began reading trade publications on horse breeding and racing.

In 1985 (in an attempt to follow in the footsteps of Mrs. Donoghue's grandfather who had passed away by then) petitioners decided to start their horse

**[*4]** activity. They formed an equal partnership named Marestelle Farm to breed and race world class thoroughbred horses.

Mrs. Donoghue handled the operations side of Marestelle Farm, i.e., studying horse bloodlines, searching for horses to breed with their horses, and managing the care and training of their horses. In 1993, for example, after petitioners' first horse successfully delivered a male foal at Fulmer International Farm in South Carolina, Mrs. Donoghue spent some time there working with the foal and as an apprentice for Robert Hall, a licensed thoroughbred race trainer.

Mrs. Donoghue also served as the bookkeeper for Marestelle Farm. Mr. Donoghue handled the remaining financial aspects of Marestelle Farm, i.e., serving as the controller (including ensuring that Marestelle Farm's filing obligations with the Internal Revenue Service (IRS) were met).

During the years at issue petitioners owned (and Marestelle Farm consisted of) a total of six horses. They did not, however, breed, race, or sell any of their horses during these years. The industry norm for racing a horse is 24 races per year. The last year petitioners raced any of their horses was 2008. They stopped

**[*5]** their horse activity in 2014.  From its inception in 1985 through 2014, their activity never had a profitable year.[3]

A.    Petitioners' Horses

Petitioners owned six horses during the years at issue in connection with Marestelle Farm:  Lilac Domino, Lainies Calliope, Canajorie, Dr. Davies, Run the Credits, and Whaleman.[4]

Lilac Domino, a mare born in 1979, was the first horse petitioners owned with respect to their horse activity.  Mrs. Donoghue spent three years researching horse bloodlines before petitioners purchased Lilac Domino in 1988.  On the basis of Mrs. Donoghue's research they thought that Lilac Domino had fantastic bloodlines, but they were able to purchase her for a bargain price because she was severely lame.  Lilac Domino was Mrs. Donoghue's dream horse, and she was the only horse petitioners acquired other than through breeding.

In 1992, after Lilac Domino was nursed back to health, petitioners bred her with a stallion named Secretary of State; she successfully delivered a male foal

---

[3]For further discussion of Marestelle Farm's financial performance, see infra pp. 14-16.

[4]As discussed infra pp. 5-8, before the years at issue Lilac Domino foaled Sir Manatee and Lainies Calliope foaled Whaleman, Seal E. Dan, and Fine Artist, but by 2010 Whaleman was the only one of these foals that petitioners continued to own.

[*6] named Sir Manatee at Fulmer International Farm. In 1994 Lilac Domino was bred with Secretary of State again and successfully delivered a female foal named Lainies Calliope.[5] Lilac Domino died in 2011.

Petitioners entered Sir Manatee in a couple of races and bred him before selling him in 2007 for $2,500.[6] Petitioners never raced Lainies Calliope; instead she became petitioners' "second generation broodmare." Lainies Calliope produced six foals for petitioners: (1) Whaleman, (2) Seal E. Dan, (3) Canajorie, (4) Dr. Davies, (5) Run the Credits, and (6) Fine Artist.

In 2001 Lainies Calliope foaled Whaleman, a stallion, at Overbrook Farm in Kentucky. Whaleman's racing "career" consisted of racing 24 times from 2004 to 2006 at Suffolk Downs racetrack in Massachusetts (which petitioners considered their local track) and once in 2004 at Belmont Park in New York,[7] earning a total

---

[5]Aside from Sir Manatee and Lainies Calliope, Lilac Domino successfully delivered one other horse, but this was at a time when petitioners did not own Lilac Domino.

[6]Petitioners did not report this sale on their 2007 joint Form 1040, which reported income attributable to Marestelle Farm of zero.

[7]Petitioners most frequently raced their horses at Suffolk Downs. Mrs. Donoghue secured a license to race their horses in Florida in furtherance of her dream to participate in the Florida Derby in homage to her grandfather, who had raced at Gulfstream Park in Florida, but that dream never came to fruition. At a time not established by the record petitioners also tried racing in New York in

(continued...)

[*7] of $12,850.  At the time of trial petitioners were leasing him as a riding horse in Maine and no longer incurring expenses with respect to him.  Petitioners would like to sell him, but he has a problem with colic.

In 2002 Lainies Calliope foaled Seal E. Dan, a stallion.  Petitioners sold him in 2005 for $3,500.

In 2003 Lainies Calliope foaled Canajorie, a stallion.  He was diagnosed with an insect disease and never generated any income.  Petitioners put Canajorie up for sale; but at the time of trial they were no longer trying to sell him because of the insect disease.  Canajorie is in Massachusetts, and petitioners are incurring expenses for him.

In 2004 Lainies Calliope foaled Dr. Davies, a mare.  Dr. Davies raced 15 times, earning a total of $6,752.  Since 2008 or 2009 petitioners have been training her for sale.  They would like to sell her for $30,000; at a time not established by the record petitioners received an offer of $15,000, but they rejected it.

In 2005 Lainies Calliope foaled Run the Credits, a mare.  She never generated any income.  Petitioners have been trying to sell Run the Credits since two to three years after her birth.

---

[7](...continued)
pursuit of larger racing purses, but they found the daily fees charged to race in New York too expensive to continue racing there.

**[\*8]**   In 2009 Lainies Calliope foaled Fine Artist, a stallion.  Petitioners, however, never owned or had any rights to Fine Artist and did not receive a fee for this breeding.

B.     <u>Marestelle Farm's Operations</u>

Marestelle Farm was a "virtual farm".  Petitioners never actually owned a farm or a facility where they kept and trained their horses but instead paid other farms to do so.  Although petitioners lived in Massachusetts during all of the years of their horse activity, the farms they used were in multiple States, including Massachusetts, South Carolina, Kentucky, Florida, and New York.

When their horses were in active race training, petitioners paid "day rates" to these farms for them to feed, care for, exercise, and train their horses.  Petitioners also sometimes entered into special arrangements with these farms to reduce their boarding expenses.  These arrangements included "rough boarding", where petitioners traveled daily to a farm for approximately 30 weeks to care for their horse or horses boarded there, and "performance training", where petitioners leased their horse or horses to be used and trained for performance activities in return for free boarding.  Finally, petitioners bartered for boarding expense relief in exchange for allowing another farm to breed one of their mares and own the resulting foal.

[*9]   Petitioners used advertising when they attempted to sell or breed any of their horses during the years at issue.  They paid a total of $522 for advertising services during these years; otherwise they advertised their horses on a free internet registry.

Over the years petitioners funded Marestelle Farm through a combination of their available cash, distributions from an individual retirement account (IRA), and mortgage borrowing.  From 1985 to 2012 the funding amounts included $399,176 in total cash, $337,527 from IRA distributions, and $271,600 of mortgage borrowing.

C.     Time Petitioners Devoted to Marestelle Farm

Operating Marestelle Farm never developed into a full-time activity for petitioners, and during the years at issue petitioners kept neither kept a mileage log nor a contemporaneous time log reporting the hours spent with respect to Marestelle Farm.  However, during the audit of their joint Forms 1040 for the years at issue petitioners created two spreadsheets--one for 2010 and another for 2011--which reported the total hours they each purportedly spent with respect to Marestelle Farm.  The 2010 spreadsheet reported 1,657 and 1,276 hours spent by Mrs. and Mr. Donoghue, respectively, and the 2011 spreadsheet reported 1,462 and 1,021 hours spent by Mrs. and Mr. Donoghue, respectively.  All of these

**[*10]** reported hours were estimates, and no actual dates were associated with them; instead, the hours were reported by activity performed. Petitioners created these spreadsheets on the basis of their discussions in conjunction with "reviewing dozens of pendaflex file folder labels contained in the multiple cabinets of files" in their "business office." Petitioners did not create a spreadsheet for 2012.[8]

D.    Petitioners' Business Plans and Expert Advice Pertaining to Marestelle Farm

Petitioners had written business plans for Marestelle Farm from 1988 to 2012. Their initial plan included sections titled "Business Executive Summary", "Business Objective", "Business Goal", and "Business Financials". Petitioners reproduced this plan annually, and up through 2006, except for the "Business Financials" section, the other sections did not change from year to year.

The "Business Executive Summary" section stated in pertinent part that "Marestelle Farm is in the business of breeding world class thoroughbred horses for racing", "[b]usiness income will be derived from thoroughbred racing purses and breeding income derived from successful race horse offspring of LILAC DOMINO", and "[p]rofits will be produced when race purse and breeding income exceed business expenses."

---

[8]In their answering brief petitioners state that the hours spent with respect to Marestelle Farm for 2012 were "similar" to those in 2011.

[*11] The "Business Objective" section stated in pertinent part that "Marestelle Farm's objective is to produce well tempered, reliable and trainable thoroughbred race horses based on * * * selective line breeding * * *, which when put into service, reduce the risk of race training injury and increase the potential to which the horse can be trained and ultimately produce generations of winning race horse stock for profit."

The "Business Goal" section stated in pertinent part how the goal of Marestelle Farm was to produce a profitable breeding race horse stock from a single foundation broodmare with top bloodlines.

The "Business Financials" section stated Marestelle Farm's planned income and expenses. Never did this section state that Marestelle Farm was projected to earn a profit. More specifically, petitioners' 1988-2006 plans stated the following:

| Year | Planned income | Planned expenses | Planned loss |
| --- | --- | --- | --- |
| 1988 | 0 | $15,000 | $15,000 |
| 1989 | 0 | 15,000 | 15,000 |
| 1990 | 0 | 15,000 | 15,000 |
| 1991 | 0 | 15,000 | 15,000 |
| 1992 | 0 | 15,000 | 15,000 |
| 1993 | 0 | 20,000 | 20,000 |
| 1994 | 0 | 40,000 | 40,000 |

| | | | |
|---|---|---|---|
| 1995 | 10,000 | 40,000 | 30,000 |
| 1996 | 10,000 | 55,000 | 45,000 |
| 1997 | 10,000 | 55,000 | 45,000 |
| 1998 | 10,000 | 55,000 | 45,000 |
| 1999 | 10,000 | 55,000 | 45,000 |
| 2000 | 10,000 | 60,000 | 50,000 |
| 2001 | 15,000 | 70,000 | 55,000 |
| 2002 | 15,000 | 70,000 | 55,000 |
| 2003 | 30,000 | 80,000 | 50,000 |
| 2004 | 35,000 | 80,000 | 45,000 |
| 2005 | 30,000 | 50,000 | 20,000 |
| 2006 | 35,000 | 60,000 | 25,000 |

Petitioners' 2007-12 plans differed from their 1988-2006 plans in that they no longer included the aforementioned sections; instead, they included sections titled "Business Activity Plans", "Racing Plans", "Sales Plans", "Training Plans", and "Management Plans". These sections were virtually identical from year to year.

The "Business Activity Plans" section stated in pertinent part that petitioners would "continue to market breeding sales contracts efforts" for Run the Credits, Dr. Davies, and Lainies Calliope and "continue horse management activities for all horses in inventory". The "Racing Plans" section stated that

[*13] petitioners would "wait[] for rumored Casino activities to restore profitable horse racing" in Massachusetts. The "Sales Plans" section stated that petitioners would "work on" buyers in performance horse disciplines and thoroughbred breeding disciplines. The "Training Plans" section recited that petitioners would "increase value of inventory through performance horse training". The "Management Plans" section stated that petitioners would work to "sell horses", "lease horses", "keep all horses healthy", "keep sales horses in training", "keep pensioned broodmare healthy", "stay abreast of rumored Casino activities", and "reduce expenses with horse leases". None of petitioners' 2007-12 plans stated projected income, expenses, or profit/loss for Marestelle Farm.

Petitioners did not consult with anyone in preparing any of their business plans. At a time not established by the record Mrs. Donoghue did speak with two individuals who were training petitioners' horses for sale about whether to sell their horses. Their advice to her was to "hang onto your asset to wait for the economy to turn around". Apart from this advice, the record is silent as to any specific business advice petitioners sought or received to make Marestelle Farm profitable.

**[*14]** E.     Marestelle Farm's Books and Records

Petitioners maintained a separate bank account for Marestelle Farm for at least part of 2008 through 2011.  They kept a listing of Marestelle Farm's income and expenses for the years at issue using the computer software program Quicken.  This listing had three categories of income:  breeding, sales, and racing; none of these categories showed income for the years at issue.  This listing had various categories of expenses, such a advertising, boarding (per each horse), equipment, fees, gifts, postage, shipping, supplies, taxes, training, travel, veterinarian, truck payment, and life insurance.

F.     Marestelle Farm's Financial Performance

From 1985 to 2012 Marestelle Farm incurred expenses totaling $1,008,303 but realized income totaling only $33,691, resulting in accumulated losses of $974,612.  Petitioners have never earned a profit from their horse activity.  On their joint Forms 1040 for 1997 to 2012 they reported the following losses attributable to Marestelle Farm:[9]

---

[9]Beginning at least as early as 1997 and continuing through 2008, petitioners reported their horse activity on Schedules C, Profit or Loss From Business, attached to their joint Forms 1040, despite the fact that Marestelle Farm was formed as a partnership in 1985.  Additionally, on each Schedule C Mr. Donoghue was listed as the sole proprietor of their horse activity.  For 2009 and the years at issue petitioners reported their horse activity on Forms 1065, U.S.

(continued...)

[*15]

| Year | Net profit/(loss) |
|------|-------------------|
| 1997 | No gain or loss reported |
| 1998 | ($105,513) |
| 1999 | (39,391) |
| 2000 | (66,236) |
| 2001 | (62,864) |
| 2002 | (37,800) |
| 2003 | (171,893) |
| 2004 | (125,955) |
| 2005 | (52,546) |
| 2006 | (69,981) |
| 2007 | (45,247) |
| 2008 | (45,214) |
| 2009 | (44,456) |
| 2010 | (52,554) |
| 2011 | [1](69,719) |
| 2012 | (61,028) |

[1]As discussed infra p. 17, petitioners' 2011 joint Form 1040 and attached Schedule E reported a loss of $69,785 attributable to Marestelle Farm. However, Marestelle Farm's 2011 Form 1065 reported a loss of $69,719, and the notice of deficiency determined a Schedule E adjustment of $69,719 for 2011. The record is silent as to what contributes to the discrepancy.

---

[9](...continued)
Return of Partnership Income, and accordingly on Schedules E, Supplemental Income and Loss, attached to their joint Forms 1040.

[*16] G.     Petitioners' Tax Returns

Throughout the history of their horse activity petitioners employed several different tax return preparation/accounting firms to prepare their joint Forms 1040 (as well as Marestelle Farm's Forms 1065).  At least for the years at issue, despite employing these firms petitioners did not receive any advice regarding the deductibility of items relating to their horse activity.

H&R Block prepared and timely filed petitioners' 2010 joint Form 1040. The income section of this form reported wages attributable to Mr. Donoghue of $84,742, taxable interest of $66, ordinary dividends of $22, taxable refunds, credits, or offsets of State and local income taxes of $4,981, and Social Security benefits attributable to Mrs. Donoghue of $17,634 ($7,763 of which was the taxable amount).  The income section also reported a loss of $52,554 for "Rental real estate, royalties, partnership, S corporations, trusts, etc."  This loss is the loss attributable to petitioners' horse activity as reflected on Marestelle Farm's 2010 Form 1065 and their attached Schedule E.  The tax and credits section of the form claimed itemized deductions totaling $32,348 and two exemptions (one for Mr. Donoghue and the other for Mrs. Donoghue), and reported total tax of $538 (on the basis of taxable income of $5,372).  Finally, the form reported payments totaling $9,733 ($9,183 for Federal income tax withheld from Mr. Donoghue's

**[*17]** wages and $550 for the making work pay credit), for a total claimed refund of $9,195.

H&R Block also prepared and timely filed petitioners' 2011 joint Form 1040. The income section of this form reported wages attributable to Mr. Donoghue of $88,468, taxable interest of $37, taxable refunds, credits, or offsets of State and local income taxes of $2,943, and Social Security benefits attributable to Mrs. Donoghue of $17,634 (zero of which was the taxable amount). The income section also reported a loss of $69,785 for "Rental real estate, royalties, partnership, S corporations, trusts, etc.", attributable to petitioners' horse activity as reflected on Marestelle Farm's 2011 Form 1065 and their attached Schedule E. The tax and credits section of the form claimed itemized deductions totaling $31,909 and two exemptions (again, one for Mr. Donoghue and the other for Mrs. Donoghue), and reported total tax of zero (on the basis of taxable income of zero). Finally, the form reported Federal income tax withheld from Mr. Donoghue's wages of $10,341, for a total claimed refund of $10,341.

Mr. Donoghue prepared and timely filed petitioners' 2012 joint Form 1040. On this form they reported wages attributable to Mr. Donoghue of $93,099, taxable interest of $104, taxable refunds, credits, or offsets of State and local income taxes of $4,022, and Social Security benefits attributable to Mrs.

[*18] Donoghue of $18,275 (zero of which was the taxable amount). They also reported in the income section of this form a loss of $61,406, attributable to the $61,028 loss from their horse activity as reflected on Marestelle Farm's 2012 Form 1065 and their attached Schedule E, and a $378 loss from a partnership named Global World Shares. In the tax and credits section of the form they claimed itemized deductions totaling $30,654 and two exemptions (again, one for Mr. Donoghue and the other for Mrs. Donoghue), and reported total tax of zero (on the basis of taxable income of zero). Finally, they reported Federal income tax withheld from Mr. Donoghue's wages of $10,930, for a total claimed refund of $10,930.

### H.    Audit and Determination

Following an audit of petitioners' joint Forms 1040 for the years at issue respondent in pertinent part disallowed petitioners' claimed loss deductions with respect to Marestelle Farm on the ground that they did not materially participate in Marestelle Farm[10] and asserted accuracy-related penalties against them.

In his answer respondent asserts, as an additional (and now predominant) reason for disallowance of petitioners' claimed losses attributable to Marestelle

_____

[10]Respondent also disallowed amortization expenses of $29,000 shown on Marestelle Farm's Forms 1065 for each of the years at issue due to lack of substantiation.

**[\*19]** Farm, that they did not engage in their horse activity for profit within the meaning of section 183.

The record includes (1) a completed Civil Penalty Approval Form for section 6662(a) accuracy-related penalties due to substantial understatements of income tax for the years at issue and (2) a Letter 950, i.e., 30-day letter, to petitioners reflecting the IRS' proposed changes to their Federal income tax for the years at issue, including the imposition of these penalties. The completed Civil Penalty Approval Form includes a signature on the line provided on the form for "Group Manager Approval to Assess Penalties Identified Above" dated March 10, 2014, the same date as the 30-day letter and before the issuance of the notice of deficiency.[11]

---

[11]As explained infra pp. 41-46, we are reopening the record to admit the Civil Penalty Approval Form and a declaration of IRS Revenue Agent Kimberly B. McCarthy insofar as it authenticates the Civil Penalty Approval Form for purposes of Fed. R. Evid. 902(11). As also explained infra pp. 41-46, we are reopening the record to now admit Exhibit 23-P in its entirety. Exhibit 23-P is much of the IRS examination and Office of Appeals files pertaining to petitioners and Marestelle Farm and includes the 30-day letter (in addition to the Civil Penalty Approval Form). At trial respondent objected to the admission of this exhibit, and the Court sustained that objection.

**[\*20]**                                       OPINION

I.      Burden of Proof

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

But when the Commissioner raises a new matter (or raises an increase in the deficiency or pleads affirmative defenses) in the answer, he bears the burden of proof as to the new matter (or the increased deficiency or affirmative defenses).  Rule 142(a)(1); Roberts v. Commissioner, 141 T.C. 569, 575 (2013).  A new matter includes "[a] new theory that * * * either alters the original deficiency or requires the presentation of different evidence."  Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989) (and cases cited threat).  In his answer respondent asserted a new theory, to wit, that petitioners did not engage in their horse activity for profit pursuant to section 183.  Respondent concedes that he has the burden of proof with respect to the section 183 issue.

[*21] As for respondent's determinations set forth in the notice of deficiency, petitioners suggest (only in passing in their answering brief) that the burden of proof should shift to respondent under section 7491(a). Under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his Federal income tax liability and meets certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. The record, however, does not establish that the requirements for shifting the burden of proof have been met; therefore, the burden of proof remains on petitioners to the extent of respondent's determinations reflected in the notice of deficiency.

## II. Section 183

Generally, the Code allows deductions for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business or for the production of income. Secs. 162(a), 212(1). Under section 183, if an activity is not engaged in for profit, such as an activity primarily carried on for sport, as a hobby, or for recreation, then no deduction attributable to that activity is generally

**[\*22]** allowed except as provided for in subsection (b).[12]  See sec. 1.183-2(a), Income Tax Regs.

Taxpayers (such as petitioners) that operate an activity as a partnership must show that they engaged in the activity with an actual and honest objective of making a profit at the partnership level.  Brannen v. Commissioner, 78 T.C. 471, 505-506 (1982), aff'd, 722 F.2d 695 (11th Cir. 1984); see also Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  Profit in this context means economic profit, independent of tax savings.  Hulter v. Commissioner, 91 T.C. at 393.

Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances.  Sec. 1.183-2(b), Income Tax Regs.; see also Estate of Power v. Commissioner, T.C. Memo. 1983-552, 46 T.C.M. (CCH) 1333, 1338 (1983), aff'd, 736 F.2d 826 (1st Cir. 1984).  We accord greater weight to objective facts than to subjective statements of intent.  Sec. 1.183-2(a), Income Tax Regs.; see also Estate of Power v. Commissioner, 46 T.C.M. (CCH) at 1338.

---

[12]Sec. 183(b) allows deductions that would have been allowable had the activity been engaged in for profit but only to the extent of gross income derived from the activity (reduced by deductions attributable to the activity that are allowable without regard to the whether the activity was engaged in for profit).

[*23] In this case we gauge the profit intent of Marestelle Farm from that of petitioners, its equal partners. Evidence from years outside the years at issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in the subject years. See, e.g., Smith v. Commissioner, T.C. Memo. 1993-140.

Pursuant to section 183(d), an activity consisting in major part of breeding, training, showing, or racing horses is presumed to be engaged in for profit if the activity produces gross income in excess of deductions for any two of the seven consecutive years which end with the taxable year, unless the Commissioner establishes to the contrary. See Wadlow v. Commissioner, 112 T.C. 247, 250 (1999). Marestelle Farm never produced gross income in excess of deductions for purposes of invoking the presumption. Accordingly, the presumption does not apply here.

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of nine factors to consider in evaluating a taxpayer's profit objective. These factors are: (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his or her advisers, (3) the time and effort spent by the taxpayer in carrying on the activity, (4) the expectation that the assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or

**[\*24]** dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profits earned, if any, (8) the financial status of the taxpayer, and (9) whether elements of personal pleasure or recreation were involved. Sec. 1.183-2(b), Income Tax Regs.; see also Filios v. Commissioner, 224 F.3d 16, 21 (1st Cir. 2000), aff'g T.C. Memo. 1999-92. No single factor or group of factors is determinative and more weight may be given to some factors than others. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); Vitale v. Commissioner, T.C. Memo. 1999-131, slip op. at 17-18, aff'd without published opinion, 217 F.3d 843 (4th Cir. 2000); see also Green v. Commissioner, T.C. Memo. 1989-436, 57 T.C.M. (CCH) 1333, 1343 (1989) (noting that all nine factors do not necessarily apply in every case); sec. 1.183-2(b), Income Tax Regs. We examine each of these factors in turn.

    A.    <u>Manner in Which the Activity Is Conducted</u>

The fact that a taxpayer conducts an activity in a businesslike manner may indicate a profit motive. Sec. 1.183-2(b)(1), Income Tax Regs. In making this determination we consider whether the taxpayer (1) maintained complete and accurate books and records for the activity; (2) prepared a business plan; (3) conducted the activity in a manner substantially similar to comparable

**[*25]** activities that were profitable; (4) changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability; and (5) in the case of horse breeding and sales, ran a consistent and concentrated advertising program. Judah v. Commissioner, T.C. Memo. 2015-243, at *34 (and cases cited threat); see also Williams v. Commissioner, T.C. Memo. 2018-48, at *21-*22.

Petitioners contend that they operated Marestelle Farm in a businesslike manner because they kept "reasonable" books and records, conducted their horse activity with professional advisors and in a manner comparable to other profitable horse businesses in Massachusetts during in particular the "Great Recession" (which they characterize as beginning in 2007) and the years at issue, maintained "reasonable" business plans, and made changes to their operating procedures in response to issues they encountered, such as the Great Recession. The evidence in the record, however, belies petitioners' contentions.

During the years at issue petitioners did not breed, race, or sell any of their horses. According to Mr. Donoghue, the industry norm for racing a horse was 24 races per year. Yet petitioners never had a horse that raced 24 times in one year, and the last year that one of their horses raced was 2008. The last year petitioners bred one of their horses was 2009 (and with that breeding they did not receive a

[*26] breeding fee or own or have any rights to the foal). It stands to reason that a thoroughbred horse breeding and racing business, if truly a business and not a hobby, sport, or recreational activity, would be actively engaged in either breeding or racing horses; Marestelle Farm did neither during the years at issue.

Although petitioners maintained a separate bank account for Marestelle Farm for at least part of 2008 through 2011 and kept a list of Marestelle Farm's income and expenses for the years at issue using Quicken, their books and records were far from accurate and complete. For many years petitioners reported their income and expenses related to Marestelle Farm as if it was a sole proprietorship owned by Mr. Donoghue alone, despite the fact that since its inception in 1985 it was actually a partnership. In 2007 petitioners sold Sir Manatee for $2,500, but on their joint Form 1040 for that year they reported income attributable to Marestelle Farm of zero. Petitioners also failed to keep a mileage log or a contemporaneous time log reporting the hours spent with respect to Marestelle Farm for the years at issue.

For at least the years at issue petitioners did not maintain their books and records with the objective of making a profit. As we have previously stated: "A taxpayer must maintain books and records for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation".

[*27] Judah v. Commissioner, at *34 (citing Betts v. Commissioner, T.C. Memo. 2010-164). Marestelle Farm's net losses during each of the years at issue were greater than in 2007, 2008, or 2009. In fact, Marestelle Farm never had a profitable year. Indeed, it is apparent that petitioners did not properly use the written business plans they had in place from 1988 to 2012. They prepared each plan on their own without consulting anyone. The 1988-2006 plans did not change from year to year, and each plan projected a net loss. The 2007-12 plans were virtually identical, and no financial projections were set forth in these plans. These plans illustrate that petitioners intended (or at least projected) that Marestelle Farm would lose money year after year, which, of course, is the polar opposite of an activity engaged in for profit.

Petitioners attempt to justify Marestelle Farm's lack of profit by asserting that it was in a startup phase or a series of successive startup phases for each generation of foals from 1985 to 2012. We reject that notion. We have previously held that the startup phase for a horse breeding activity is 5 to 10 years. See Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). In this case Marestelle Farm's startup phase ended in 1995 at the latest, yet it continued to suffer losses.

According to petitioners, in order to improve Marestelle Farm's profitability they changed its operations and procedures by no longer racing or breeding their

[*28] horses and instead offering them up for sale and also by cutting expenses by leasing, rough boarding, and putting into training arrangements some of their horses. However, it is incredible to think that ceasing racing and breeding, no matter the amount of expenses cut, could lead to profitability.

Petitioners never ran a consistent and concentrated advertising program. In attempting to sell or breed their horses they spent only a total of $522 on advertising during the years at issue; their only other advertising activity was to list their horses on a free internet registry. See Bronson v. Commissioner, T.C. Memo. 2012-17, slip op. at 19 (citing Golanty v. Commissioner, 72 T.C. at 431), aff'd, 591 F. App'x 625 (9th Cir. 2015).

Accordingly, this factor weighs heavily in favor of respondent's position.

B.      Expertise of Petitioners or Their Advisors

A taxpayer's own expertise, research, and extensive study of an activity, or consultation with experts, may indicate a profit objective. Sec. 1.183-2(b)(2), Income Tax Regs. This factor focuses on whether the taxpayer "received advice from the experts as to the accepted principles and economics of profitably running a business and not merely the general advice that a horse enthusiast would seek in training and showing horses as a hobby." Betts v. Commissioner, slip op. at 19 (and cases cited threat).

[*29] As a child Mrs. Donoghue read trade publications on horse breeding and racing and over several decades has diligently researched horse bloodlines. Mrs. Donoghue also presumably received some advice and guidance from her grandfather, who was a successful horse breeder, although this would have been before petitioners commenced their horse activity as he had passed away by then. In 1993, after Lilac Domino successfully foaled Sir Manatee at Fulmer International Farm, she spent some time there as an apprentice for Robert Hall, a licensed thoroughbred race trainer. Thus, to be sure, she has some training and likely expertise in the breeding of horses. And Mr. Donoghue has a college degree in finance with a minor in business. However, there is no evidence in the record that either Mr. or Mrs. Donoghue acquired, or even sought, expertise as to the economics of profitably running a horse breeding and racing activity beyond the advice an enthusiast would seek.

When petitioners were trying to decide whether to sell their horses, Mrs. Donoghue received advice from two individuals who were training their horses for sale. In their answering brief petitioners contend that these two individuals "were respected expert profession[al]s with 'international' family backgrounds, whose families had been involved with the horse industry for multiple generations, and EXPERTS in the field of RE-TRAINING and SELLING horse LIVESTOCK" and

**[*30]** "were also acting as expert consultants who advised * * * [them] on current MA Horse Industry Economics." However, there is no evidence in the record of these so-called advisors' expertise and what specific expertise or advice they conveyed to petitioners in order to help make Marestelle Farm profitable. Indeed, the record instead reflects that these so-called advisors imparted very general advice ("hang onto your asset to wait for the economy to turn around"), which clearly did not improve the profitability of Marestelle Farm.

Accordingly, this factors weighs in favor of respondent's position.

C.    Petitioners' Time and Effort Devoted to the Activity

The fact that a taxpayer devotes much of his personal time and effort to carrying on an activity may indicate a profit objective, particularly if the activity does not involve substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. But the time and effort spent on an activity that has substantial personal and recreational aspects may be due to a taxpayer's enjoyment of the activity rather than an objective of making a profit. Judah v. Commissioner, at *43.

Petitioners did not devote the necessary time and effort to establish that they had the requisite objective of making a profit. They never actually owned a farm or facility where they kept and trained their horses although during certain periods,

**[\*31]** unclear from the record, they "rough boarded" some of their horses; i.e., they traveled to a farm daily and took care of their horse or horses for several weeks. As indicated infra pp. 38-39, petitioners, Mrs. Donoghue in particular, clearly derived great pleasure from their horse activity, and they acknowledged that operating Marestelle Farm never developed into a full-time activity. Indeed, during the years at issue they did not race, breed, or sell any of their horses.

Nevertheless, in an effort to show the hours they purportedly devoted to Marestelle Farm petitioners rely on two spreadsheets--one for 2010 and another for 2011--that they created during the audit. They did not create a spreadsheet for 2012 but state that the hours spent with respect to Marestelle Farm for 2012 were "similar" to 2011. The 2010 spreadsheet reported 1,657 and 1,276 hours spent by Mrs. and Mr. Donoghue, respectively, with respect to Marestelle Farm, and the 2011 spreadsheet reported 1,462 and 1,021 hours spent by Mrs. and Mr. Donoghue, respectively, with respect to Marestelle Farm. However, these spreadsheets are not trustworthy as they were created on recollection and the hours reflected therein were estimates not associated with actual dates (but by activity performed) and there is no contemporaneous documentary evidence in the record corroborating the hours reported by activity.

**[\*32]** In their answering brief petitioners also state that their plan was to wait out the Great Recession in Massachusetts during the years at issue and to wait for Massachusetts State gaming legislation to improve the State's thoroughbred racing industry economics. Other than this waiting, there is no evidence in the record that petitioners expended any substantial time and effort to make Marestelle Farm profitable. See Rodriguez v. Commissioner, T.C. Memo. 2013-221, at \*31 (holding that taxpayers' inaction was not consistent with a for-profit business).

Accordingly, this factor weighs in favor of respondent's position.

D.   Expectation That Assets Used in the Activity May Appreciate in Value

An expectation that assets used in the activity will appreciate in value and therefore may produce an overall profit may indicate a profit motive even if the taxpayer derives no operational profit. Sec. 1.183-2(b)(4), Income Tax Regs. However, a profit objective may be inferred from the expected appreciation of assets only where the appreciation exceeds operating expenses and would be sufficient to recoup accumulated losses of prior years. Carmody v. Commissioner, T.C. Memo. 2016-225, at \*28 (and cases cited threat). A vague and unauthenticated notion that assets are appreciating in value does not constitute a bona fide expectation that the appreciation will offset past and future losses. La

**[*33]** <u>Musga v. Commissioner</u>, T.C. Memo. 1982-742, 45 T.C.M. (CCH) 422, 426 (1982).

Because petitioners operated Marestelle Farm as a "virtual farm", their only potential appreciable assets were their horses. There is no evidence in the record as to the values of their horses. However, petitioners had hoped to sell one of their horses, Dr. Davies, for $30,000, and there is evidence in the record that they received an offer of $15,000 for Dr. Davies (which they rejected). There is also evidence in the record that petitioners sold Seal E. Dan in 2005 for $3,500 and Sir Manatee in 2007 for $2,500. During the years at issue petitioners owned just five horses after their dream horse, Lilac Domino, died in 2011. Even assuming that petitioners had been able to sell their remaining five horses for $30,000 each in 2012 (an expectation they did not have), they would have received only $150,000. Yet Marestelle Farm had cumulative losses from 1985 to 2012 of $974,612. Therefore, even using the rather artificial aforementioned expected appreciation for their horses, petitioners would not come close to recouping the significant losses they incurred with respect to Marestelle Farm over the nearly 30 years they operated it; consequently, a profit objective cannot be inferred from any expected appreciation.

Accordingly, this factor weighs in favor of respondent's position.

**[*34]** E.     Success in Carrying On Other Similar or Dissimilar Activities

The fact that a taxpayer engaged in similar activities and converted them to profitable enterprises may indicate that the taxpayer engaged in the present activity for profit, even though it is presently unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.; see also Lundquist v. Commissioner, T.C. Memo. 1999-83, slip op. at 24, aff'd, 211 F.3d 600 (11th Cir. 2000).  Petitioners have not carried on any other horse activities in the past, and they offered no evidence of successful dissimilar activities or that they used any business expertise they may have acquired from other business ventures in their horse activity.  See Dodge v. Commissioner, T.C. Memo. 1998-89, slip op. at 15, aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999).  We consider this factor neutral.

F.     Petitioners' History of Income or Losses With Respect to the Activity

A taxpayer's history of income or loss with respect to an activity may indicate the presence or absence of a profit motive.  Sec. 1.183-2(b)(6), Income Tax Regs.; see also  Golanty v. Commissioner, 72 T.C. at 426.  A series of losses during the initial or startup stage of an activity does not necessarily indicate that the activity is not engaged in for profit, but losses that extend beyond the customary startup stage may.  Sec. 1.183-2(b)(6), Income Tax Regs.; see also Engdahl v. Commissioner, 72 T.C. at 669.  The goal, however, must be to realize a

[*35] profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup losses incurred in the intervening years. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967).

As indicated, Marestelle Farm has not earned a profit since its inception in 1985. From its inception to 2012 it realized income totaling $33,691 and incurred expenses totaling $1,008,303, resulting in cumulative losses of $974,612. In their answering brief petitioners attempt to justify the continued losses, asserting that Marestelle Farm was a startup business and that "it remained in the startup phase in all 30 years of operations." However, as we indicated supra p. 27, we have previously found that the startup phase for a horse breeding activity is 5 to 10 years, not 30. Engdahl v. Commissioner, 72 T.C. at 669. In 2010, the first year at issue, petitioners were already in their 25th year of their horse activity (all without a profit) and well beyond the startup phase.

Petitioners also argue that Marestelle Farm suffered losses due to the Great Recession. While Marestelle Farm's operations may have been harmed by the recession, its history of losses long predates that recession and thus the recession cannot entirely account for the losses.

Accordingly, this factor weighs heavily in favor of respondent's position.

**[*36]** G.    Amount of Occasional Profits

The amount of profits in relation to the amount of losses incurred may provide a useful criterion in determining the taxpayer's intent.  Sec. 1.183-2(b)(7), Income Tax Regs.; see also Giles v. Commissioner, T.C. Memo. 2006-15, slip op. at 41.  A taxpayer's belief that he could one day earn a substantial profit from his activity may indicate a profit objective if that belief is adequately supported.  See Giles v. Commissioner, slip op. at 41-42; see also sec. 1.183-2(b)(7), Income Tax Regs.

In their answering brief petitioners contend that thoroughbred horse breeding and racing is a highly risky activity but that it has a potential for large profits.  However, from its inception in 1985 through its dissolution in 2014, Marestelle Farm has never had a profitable year, let alone a substantial one.  Thus, petitioners' alleged belief is not adequately supported.

Accordingly, this factor weighs heavily in favor of respondent's position.

H.    Petitioners' Financial Status

A lack of substantial income from sources other than the activity may indicate that the activity is engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.; see also Helmick v. Commissioner, T.C. Memo. 2009-220, slip op. at 32. In contrast, the fact that a taxpayer derives substantial income from sources other

[*37] than the activity (particularly if losses from the activity generate substantial tax benefits) may indicate that the taxpayer is not engaged in the activity for profit, especially if personal or recreational elements are involved. Sec. 1.183-2(b)(8), Income Tax Regs.

It is undisputed that petitioners received a total of over $100,000 in wage and Social Security income in each of the years at issue ($102,376 in 2010, $106,102 in 2011, and $111,374 in 2012). After applying their Schedule E deductions attributable to Marestelle Farm ($52,554 in 2010, $69,719 in 2011, and $61,028 in 2012) petitioners reported total tax due of $538 in 2010 and zero in 2011 and 2012.

Section 183 does not apply just to wealthy individuals as even taxpayers with modest tax liabilities can have a motive to shelter those liabilities. Helmick v. Commissioner, slip op. at 33. In this instance petitioners' claimed losses allowed them to shield their other income from tax and significantly reduced the after-tax cost of their horse activity. See Hillman v. Commissioner, T.C. Memo. 1999-255, slip op. at 24; Sullivan v. Commissioner, T.C. Memo. 1998-367, slip op. at 35, aff'd without published opinion, 202 F.3d 264 (5th Cir. 1999).

Accordingly, this factor weighs in favor of respondent's position.

[*38] I.    Elements of Personal Pleasure or Recreation

The presence of personal motives or recreational elements in carrying on an activity may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. However, the fact that the taxpayer derives personal pleasure from engaging in the activity does not show that the taxpayer lacks a profit objective if other evidence shows the activity is conducted for profit. Id. "[A] business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972); see also Giles v. Commissioner, slip op. at 33. But if the chance for profit is small relative to the potential for gratification, the latter may emerge as the primary motivation for the activity. See Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *32 (citing White v. Commissioner, 23 T.C. 90, 94 (1954), aff'd per curiam, 227 F.2d 779 (6th Cir. 1955)).

Petitioners clearly enjoyed owning horses. They began their horse activity when Mrs. Donoghue found her dream horse, Lilac Domino. As a child Mrs. Donoghue fell in love with thoroughbred horses because of her grandfather, a successful thoroughbred racing horse breeder. Indeed, Mrs. Donoghue's sentimental feelings toward horse breeding and racing played a role not just in

[*39] petitioners' decision to begin their horse activity but also in the manner in which they conducted the activity. For example, the reason she secured a license to race their horses in Florida was in homage to her grandfather, who had raced at Gulfstream Park. Petitioners' possibility of profit was small compared to the possibility for gratification to them, Mrs. Donoghue in particular, from the activity, and they left the most grueling aspects of caring for their horses to paid professionals.

Accordingly, this factor weighs in favor of respondent's position.

J.    Conclusion

Of the nine factors listed in section 1.183-2(b), Income Tax Regs., eight favor respondent and one is neutral. After weighing the factors and the facts and circumstances of this case, we conclude that petitioners did not have an actual and honest objective to operate Marestelle Farm for profit during the years at issue. Accordingly, we sustain respondent's disallowance of petitioners' claimed loss deductions attributable to Marestelle Farm for the years at issue on the ground that they did not engage in their horse activity for profit within the meaning of section 183.

**[*40]** III.   Section 6662(a) Accuracy-Related Penalties

We now address whether petitioners are liable for accuracy-related penalties under section 6662(a) for the years at issue.

Various grounds for the imposition of these penalties are set forth in the notice of deficiency although only one accuracy-related penalty for a given year may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one ground. Sec. 1.6662-2(c), Income Tax Regs. We need only address respondent's claim that petitioners are liable for accuracy-related penalties for the years at issue on the ground that petitioners' underpayments of tax for these years were attributable to substantial understatements of income tax under section 6662(b)(2). For purposes of section 6662(b)(2), an understatement of tax generally means the excess of tax required to be reported on the return over the amount shown on the return. Sec. 6662(d)(2)(A). An understatement of income tax is substantial in the case of an individual if it exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1). Petitioners' income tax was understated by $8,491, $9,316, and $10,353, respectively, for 2010, 2011, and 2012. As determined in the notice of deficiency petitioners' understatements of income tax for the years at issue were substantial.

**[\*41]** The Commissioner bears the burden of production with respect to accuracy-related penalties. Sec. 7491(c). Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. See Rule 142(a); Welch v. Helvering, 290 U.S. at 115; Higbee v. Commissioner, 116 T.C. 438, 447 (2001). Section 6751(b)(1) provides that "[n]o penalty * * * shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." In Graev v. Commissioner (Graev III), 149 T.C. 485, 493 (2017), supplementing and overruling in part Graev v. Commissioner (Graev II), 147 T.C. 460 (2016), we held that the Commissioner's burden of production under section 7491(c) includes establishing compliance with the supervisory approval requirement of section 6751(b). Further, we recently held that, for purposes of section 6751(b), the IRS' 30-day letter can be the "initial determination". Clay v. Commissioner, 152 T.C. ___, ___ (slip op. at 43-44) (Apr. 24, 2019).

Trial of this case was held, and the record was closed, before we vacated in part our decision in Graev II and issued Graev III (and issued Clay). In the light of Graev III, we ordered respondent to file a response addressing the effect of section 6751(b) on this case and directing the Court to any evidence of section 6751(b)

[*42] supervisory approval in the record and petitioners to respond. Respondent was unable to direct the Court to any evidence in the record that satisfies his burden of production with respect to section 6751(b)(1) and filed a motion to reopen the record to offer into evidence in pertinent part (1) the declaration of Ms. McCarthy, the IRS revenue agent who conducted the audit of petitioners' joint Forms 1040 for the years at issue and recommended imposing section 6662(b)(2) accuracy-related penalties for substantial understatements of income tax for the years at issue, and (2) the Civil Penalty Approval Form for the years at issue, dated contemporaneously with the 30-day letter to petitioners and before the issuance of the notice of deficiency and signed by Michael Edelstein, Ms. McCarthy's immediate supervisor.[13] Respondent also separately filed a motion to withdraw his objection to the admission of the pages of Exhibit 23-P which consist of the Civil

---

[13]Additionally with this motion respondent offers into evidence (1) the declaration of IRS Appeals Officer Camesia V. Anderson, who was assigned petitioners' case in the IRS Office of Appeals and recommended imposing sec. 6662(b)(1) accuracy-related penalties for negligence or disregard of rules or regulations for the years at issue and (2) a copy of the notice of deficiency that set forth the imposition of sec. 6662(b)(1) and (2) accuracy-related penalties (as well as sec. 6662(b)(3) and (4) accuracy-related penalties) and that was signed by Mark C. Pettigrew, Ms. Anderson's immediate supervisor. The record contains a copy of the notice of deficiency without the signature page. Since we need only address respondent's claim that petitioners are liable for sec. 6662(b)(2) accuracy-related penalties, it is unnecessary for us to address the admissibility of this proffered evidence.

[*43] Penalty Approval Form. As we indicated supra note 11, Exhibit 23-P includes, in addition to this form, the IRS' 30-day letter, which was also signed by Mr. Edelstein. Petitioners objected to the introduction of any additional evidence with respect to the penalties and requested that the Court deny respondent's motions.

Reopening the record for the submission of additional evidence lies within the Court's discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); Rivera-Flores v. P.R. Tel. Co., 64 F.3d 742, 746 (1st Cir. 1995); Butler v. Commissioner, 114 T.C. 276, 286-287 (2000); see also Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 363 (9th Cir. 1974) ("[T]he Tax Court's ruling [denying a motion to reopen the record] is not subject to review except upon a demonstration of extraordinary circumstances which reveal a clear abuse of discretion."), aff'g T.C. Memo. 1971-200. We will not grant a motion to reopen the record unless, among other requirements, the evidence relied on is not merely cumulative or impeaching, is material to the issues involved, and probably would change some aspect of the outcome of the case. Butler v. Commissioner, 114 T.C. at 287; see also SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986) (explaining that the trial court "should take into account, in considering a motion to hold open the trial record, the character of the additional * * * [evidence] and the effect of

**[\*44]** granting the motion"), overruled on other grounds by Pinter v. Dahl, 486 U.S. 622 (1988).

In reviewing motions to reopen the record, courts have considered when the moving party knew that a fact was disputed, whether the evidentiary issue was foreseeable, and whether the moving party had reason for the failure to produce the evidence earlier. See, e.g., George v. Commissioner, 844 F.2d 225, 229-230 (5th Cir. 1988) (and cases cited threat) (holding that refusal to reopen the case was not an abuse of discretion because the issue was foreseeable to the taxpayers and the court could see no excuse for the taxpayers' failure to produce evidence earlier), aff'g Frink v. Commissioner, T.C. Memo. 1984-669. We also balance the moving party's diligence against the possible prejudice to the nonmoving party. In particular we consider whether reopening the record after trial would prevent the nonmoving party from examining and questioning the evidence as it would have during the proceeding. See, e.g., Estate of Freedman v. Commissioner, T.C. Memo. 2007-61; Megibow v. Commissioner, T.C. Memo. 2004-41.

The evidence that is the subject of respondent's motions would not be cumulative of any evidence in the record and it would not be impeaching material. Respondent bears the burden of production with respect to penalties and would offer the evidence as proof that the requirements of section 6751(b)(1) have been

**[\*45]** met. The subject evidence is material to the issues involved in the case, and we conclude that the outcome of the case will be changed if we grant respondent's motions.

Petitioners seemingly suggest that (1) irregularities occurred not during the audit of their Forms 1040 for the years at issue but during the audit of Marestelle Farm's Forms 1065 for these same years and (2) there are irregularities with respect to the Civil Penalty Approval Form. As for their first suggestion, it is of no moment (and unsupported in any event). See Riland v. Commissioner, 79 T.C. 185, 201 (1982) (and cases cited threat). As for their second suggestion, we agree with respondent that the Civil Penalty Approval Form is a record kept in the ordinary course of a business activity and is authenticated by the declaration of Ms. McCarthy. See Fed. R. Evid. 803(6), 902(11). We also agree with respondent that the Civil Penalty Approval Form is material to the penalty issue in this case and is not cumulative. Thus, we will admit the Civil Penalty Approval Form into evidence and the declaration for purposes of authentication under rule 902(11) of the Federal Rules of Evidence. See Clough v. Commissioner, 119 T.C. 183, 190-191 (2002). Similarly, with the issuance of our Opinion in Clay, Exhibit 23-P, which includes the 30-day letter, is material to the penalty issue in this case and is not cumulative, and thus we will now admit this exhibit in its entirety into

[*46] evidence.  Respondent has met his burden of production for the accuracy-related penalties for substantial understatements of income tax for the years at issue.

Since respondent has met his burden, petitioners must come forward with persuasive evidence that the penalties are inappropriate because, for example, they had reasonable cause and acted in good faith.  See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 446-447; see also Rodriguez v. Commissioner, at *57 (finding a taxpayer's failure to satisfy section 183 does not preclude a reasonable cause and good faith defense).  The determination whether the taxpayer had reasonable cause and acted in good faith depends upon the pertinent facts and circumstances of a particular case.  Sec. 1.6664-4(b)(1), Income Tax Regs.  We consider, among other factors, the experience, education, and sophistication of the taxpayer; however, the principal consideration is the extent of the taxpayer's efforts to assess the proper tax liability.  Id.; see also Higbee v. Commissioner, 116 T.C. at 448.  Taking into consideration the taxpayer's experience, education, and sophistication, an honest misunderstanding of fact or law may indicate reasonable cause and good faith.  Higbee v. Commissioner, 116 T.C. at 449 (citing Remy v. Commissioner, T.C. Memo. 1997-72).  In addition, reliance on professional advice may indicate reasonable cause and good faith if, in the light of all the facts and

**[*47]** circumstances, such reliance was reasonable and the taxpayer acted in good faith. Id. at 448-449.

Petitioners, however, have not presented evidence to show reasonable cause or good faith for the loss deductions they claimed with respect to Marestelle Farm for the years at issue. Petitioners admit that they did not receive any advice regarding the deductibility of their horse activity losses for any of the years at issue. Petitioners are both college educated, and Mr. Donoghue has a degree in finance. Additionally, they both have experience in business; in the past Mr. Donoghue managed a construction business and Mrs. Donoghue was a corporate executive. Their professional backgrounds make it unreasonable for them to have conducted their horse activity without soliciting advice as to the deductibility of their horse activity losses for the years at issue. Simply employing tax return preparers (for 2010 and 2011) does not permit them to avoid accuracy-related penalties. See Neonatology Assocs., PA v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioners suggest that they had reasonable cause and acted in good faith because they had a prior audit for 2007 which resulted in respondent's ultimately conceding the asserted deficiency as reflected in a November 8, 2011, decision of this Court. Their suggestion, however, lacks merit. As we stated in Transupport,

[*48] <u>Inc. v. Commissioner</u>, T.C. Memo. 2016-216, at *41, <u>supplementing</u> T.C.

Memo. 2015-179, <u>aff'd</u>, 882 F.3d 274 (1st Cir. 2018):

> Petitioner again argues that the methodology was used consistently over years and was therefore correct. Petitioner apparently believes that repeating a fallacy over and over again and ignoring contrary evidence will succeed. It does not. A well-established principle is that what was condoned or agreed to for a previous year may be challenged for a subsequent year. <u>Auto. Club of Mich. v. Commissioner</u>, 353 U.S. 180 (1957); <u>Rose v. Commissioner</u>, 55 T.C. 28 (1970). Thus, the results of a prior audit do not constitute substantial authority. * * *

Accordingly, we sustain respondent's determination regarding the accuracy-related penalties for the years at issue.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.
